# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 13, 2017          Decided August 11, 2017

No. 16-1089

RHINO NORTHWEST, LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL ALLIANCE OF THEATRICAL STAGE
EMPLOYEES, LOCAL 15,
INTERVENOR

———

Consolidated with 16-1115

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Timothy A. Garnett* argued the cause for petitioner. With him on the briefs was *Heidi Kuns Durr*.

*Greg P. Lauro*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate

General Counsel, *Ruth E. Burdick*, Deputy Assistant General Counsel, and *Michael R. Hickson*, Attorney.

*Dmitri Iglitzin* argued the cause and filed the brief for intervenor.

Before: ROGERS and SRINIVASAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: Rhino Northwest, LLC, helps assemble equipment for concerts, festivals, and other events throughout the Pacific Northwest. A group of its employees called "riggers" sought to form a separate collective-bargaining unit. The National Labor Relations Board certified the proposed unit, and Rhino now challenges the Board's certification. According to Rhino, the company's other employees are so similar to its riggers that a bargaining unit cannot consist solely of the latter. Because a legitimate basis exists for excluding non-riggers from the bargaining unit, we sustain the Board's order.

I.

A.

Section 7 of the National Labor Relations Act guarantees employees the right "to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Under Section 9 of the NLRA, a proposed unit of employees must be "appropriate" for the enterprise of collective bargaining. *Id.* § 159(a). Once a group of employees petitions for union representation, "[t]he Board shall decide in each case whether, in order to assure to employees the fullest

freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." *Id.* § 159(b). This case concerns the conditions under which the Board may deem a proposed bargaining unit to be "appropriate."

Under the Board's decisions, two considerations determine the *prima facie* appropriateness of a proposed unit. First, the employees must be "readily identifiable as a group" based on such factors as "job classifications, departments, functions, work locations, [or] skills." *Specialty Healthcare & Rehab. Ctr. of Mobile*, 357 N.L.R.B. 934, 945 (2011). Second, the petitioned-for employees must share a "community of interest." *Blue Man Vegas, LLC v. NLRB*, 529 F.3d 417, 421 (D.C. Cir. 2008). The Board "weigh[s] all relevant factors on a case-by-case basis" to determine whether a set of employees are sufficiently alike to constitute an appropriate bargaining unit. *Id.* (quoting *Country Ford Trucks, Inc. v. NLRB*, 229 F.3d 1184, 1190-91 (D.C. Cir. 2000)). As long as the requisite connections exist, "the unit is *prima facie* appropriate." *Id.*

Under the Board's approach, "more than one appropriate bargaining unit logically can be defined in any particular factual setting." *Id.* (quoting *Country Ford Trucks*, 229 F.3d at 1189). As a result, an employer challenging a proposed unit must do more than show that an alternate unit would also be appropriate, or even more appropriate. Of particular salience in this case, when an employer seeks to challenge a *prima facie* appropriate unit as underinclusive, the employer must demonstrate that the unit is "truly inappropriate," as is the case when excluded employees share "an overwhelming community of interest with the included employees." *Id.* That "overwhelming community of interest" standard is

satisfied only if "there is no legitimate basis upon which to exclude certain employees." *Id.*

### B.

Rhino employs personnel who help set up venues for concerts and other planned events throughout the Pacific Northwest. Successful staging of a concert or comparable event requires various types of employees to work together. At a typical event, employees must unload the equipment, carry it to the event site, assemble it, disassemble it, and ultimately transport it back to the truck.

This case arose when the International Alliance of Theatrical Stage Employees, Local No. 15 (the Union), filed a petition with the Board seeking to represent a bargaining unit composed of all riggers employed by Rhino at its Fife, Washington facility. Riggers are responsible for "using motors to safely suspend objects overhead before events and safely removing them with motors afterwards." Reg'l Dir.'s Decision and Direction of Election at 4.

Rhino disputed the appropriateness of the proposed bargaining unit under Section 9 of the NLRA. The company maintained that any appropriate unit must include, not just riggers, but "all audio, audio/visual, camera, construction, deck hand, forklift, lighting, loading, production assistant, stagehand, video, wardrobe, climber/scaffer, rope access supervisor, and rope access technician employees" at the Fife facility. *Id.* at 1.

After a hearing, the Board regional director rejected Rhino's challenge. He first concluded that Rhino's riggers formed a facially appropriate bargaining unit because they shared a community of interest and were "readily identifiable

as a group based on their classification and function." *Id.* at 3. The regional director further determined that the employees Rhino sought to add to the bargaining unit did not share an overwhelming community of interest with the riggers. He therefore deemed the riggers to be "a unit appropriate for the purposes of collective bargaining," and directed an election among them. *Id.* at 7. The Board denied Rhino's request for review of the regional director's decision.

A majority of Rhino's riggers then voted for union representation. The regional director therefore certified the Union as the riggers' exclusive collective-bargaining representative. After Rhino refused the Union's requests to bargain, the Union filed an unfair-labor-practice charge with the Board. Rhino admitted its refusal to bargain, but claimed it had no duty to deal with the representative of an improperly certified unit.

The Board held that Rhino's refusal to bargain with the Union violated the NLRA. Rhino petitions this Court to review the Board's order, and the Board cross-applies for enforcement of the order.

II.

Rhino contends that the Board's "overwhelming community of interest" standard, articulated as such in its 2011 *Specialty Healthcare* decision, runs afoul of the NLRA. The company further contends that, even under the *Specialty Healthcare* framework, a riggers-only unit is inappropriate because an overwhelming community of interest exists between the riggers and the other Rhino employees excluded from the Union's petition. We reject both arguments.

6

A.

We review "deferentially" the Board's determination of the "unit appropriate for the purposes of collective bargaining" within the meaning of 29 U.S.C. § 159(b). *Dodge of Naperville, Inc. v. NLRB*, 796 F.3d 31, 38 (D.C. Cir. 2015). The Board's "broad" discretion "in this area . . . reflect[s] Congress' recognition of the need for flexibility in shaping the bargaining unit to the particular case." *Id.* (quoting *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 236 (D.C. Cir. 1996)); *see United Food & Commercial Workers Local 540 v. NLRB*, 519 F.3d 490, 494 (D.C. Cir. 2008). It is well-established that "the Board need only select *an* appropriate unit, not *the most* appropriate unit." *Dodge of Naperville*, 796 F.3d at 38 (quoting *Serramonte*, 86 F.3d at 236). The mere fact "[t]hat other potential unit determinations appear equally or more appropriate is insufficient to justify reversal." *Country Ford Trucks*, 229 F.3d at 1191.

The Board does face some constraints when reviewing proposed bargaining units. For instance, "[i]n determining whether a unit is appropriate[,] . . . the extent to which the employees have organized shall not be controlling." 29 U.S.C. § 159(c)(5). But the form in which employees have elected to organize, even if not controlling, may certainly be *considered. NLRB v. Metro. Life Ins. Co.*, 380 U.S. 438, 441-42 (1965). Just like any other agency decision, moreover, the Board's unit determinations cannot be sustained if they are "arbitrary" or "not supported by substantial evidence in the record." *NLRB v. Tito Contractors, Inc.*, 847 F.3d 724, 732 (D.C. Cir. 2017) (quoting *Blue Man Vegas*, 529 F.3d at 420). But "it is not for a court to substitute its own judgment for a rationally supported position espoused by the agency." *Local*

*1325, Retail Clerks Int'l Ass'n v. NLRB*, 414 F.2d 1194, 1200 (D.C. Cir. 1969).

Here, Rhino principally contends that the Board used an improper framework to assess the appropriateness of a riggers-only bargaining unit. The Board followed its decision in *Specialty Healthcare*, which set forth that an "overwhelming community of interest" standard governs the Board's determination whether certain employees can be validly excluded from a proposed bargaining unit. According to Rhino, the Board imported that standard from an entirely different context, breaking from the agency's past practice without adequate explanation. We disagree.

*Specialty Healthcare* consciously adopted the "overwhelming community of interest" standard from this Court's decision in *Blue Man Vegas*, 529 F.3d 417. There, we reaffirmed Board and judicial decisions establishing that, when a proposed bargaining unit is facially appropriate, the employer must do more than show that another unit would also share a community of interest. The employer instead must demonstrate an "overwhelming community of interest" between the included and excluded employees, such that "there is no legitimate basis upon which" to compose a bargaining unit consisting only of the former. *Id.* at 421.

We used the "overwhelming community of interest" formulation to encapsulate decisions that, in our words, "conform[ed] to a consistent analytic framework." *Id.* The Board in fact had occasionally employed exactly the same phraseology. *See, e.g.*, *Jewish Hosp. Ass'n*, 223 N.L.R.B. 614, 617 (1976) (finding a proposed bargaining unit inappropriate because of an "overwhelming community of interest" between included and excluded employees). And we, following the Board's lead, had deemed a proposed unit

"irrational" due to the absence of "any separate community of interest justifying a separate bargaining unit." *Trident Seafoods, Inc. v. NLRB*, 101 F.3d 111, 120 (D.C. Cir. 1996). The Board in *Specialty Healthcare* therefore stood on solid ground in explaining that, when assessing whether a facially appropriate unit invalidly excludes certain employees, it had "repeatedly used words that describe a heightened standard"—one that "in essence" asks whether "the included and excluded employees share an overwhelming community of interest"—even if it had invoked "slightly varying verbal formulations." 357 N.L.R.B. at 944-45.

Our own review of the decisions confirms that the Board in *Specialty Healthcare* simply took a fitting "opportunity to make clear" the exact language it would employ going forward, and that its "formulation" was "drawn from Board precedent." *Id.* at 945, 947; *see Blue Man Vegas*, 529 F.3d at 421-23. Throughout, the Board's approach has remained fundamentally the same: are individual groups of employees so similarly situated that dividing them into separate bargaining units would be irrational? We thus join seven of our sister circuits in concluding that *Specialty Healthcare* worked no departure from prior Board decisions. *See Constellation Brands, U.S. Operations, Inc. v. NLRB*, 842 F.3d 784, 792-93 (2d Cir. 2016); *FedEx Freight, Inc. v. NLRB*, 839 F.3d 636, 638 (7th Cir. 2016); *NLRB v. FedEx Freight, Inc.*, 832 F.3d 432, 441-43 (3d Cir. 2016); *Macy's, Inc. v. NLRB*, 824 F.3d 557, 567 (5th Cir. 2016); *Nestle Dreyer's Ice Cream Co. v. NLRB*, 821 F.3d 489, 500 (4th Cir. 2016); *FedEx Freight, Inc. v. NLRB*, 816 F.3d 515, 523-24 (8th Cir. 2016); *Kindred Nursing Ctrs. East, LLC v. NLRB*, 727 F.3d 552, 561 (6th Cir. 2013).

Rhino next argues that the *Specialty Healthcare* framework has caused the Board to abdicate its statutory duty

to decide the appropriateness of a proposed unit "in each case." 29 U.S.C. § 159(b). In practice, the company claims, the Board will necessarily deem appropriate any petitioned-for unit that consists of all employees sharing a job title. Rhino's concern is unfounded.

*Specialty Healthcare* itself explained that employees inside and outside a proposed unit could share an overwhelming community of interest if "the proposed unit is a 'fractured' unit." 357 N.L.R.B. at 946. Fractured units are "combinations of employees that are too narrow in scope or that have no rational basis" for including certain employees while excluding others. *Id.* (quoting *Seaboard Marine, Ltd.*, 327 N.L.R.B. 556, 556 (1999)). *Specialty Healthcare*'s own language belies the premise of Rhino's challenge: "Even if the proposed unit contained all employees occupying a nominally distinct classification, the proposed unit would be a fractured unit if, in fact, the employees in the classification did not perform distinct work under distinct terms and conditions of employment." *Id.* at 946 n.31.

In fact, the Board, both before and after *Specialty Healthcare*, has rejected proposed units consisting of an entire class or category of employees. In just one pre-*Specialty Healthcare* example, *Wal-Mart Stores, Inc.*, 328 N.L.R.B. 904 (1999), the Board refused to permit an employer's meatcutters to unionize along their preferred lines. The Board found that those employees shared "substantial common interests" with the store's wrappers and cleaners. *Id.* at 908. As for post-*Specialty Healthcare* decisions, in both *Odwalla, Inc.*, 357 N.L.R.B. 1608, 1611-12 (2011), and *A.S.V., Inc.*, 360 N.L.R.B. 1252, 1255 (2014), the Board, after describing the *Specialty Healthcare* framework, found that a proposed unit was a fractured one and that an excluded group of employees shared an overwhelming community of interest

with the petitioned-for employees. Additionally, multiple decisions by Board regional directors since *Specialty Healthcare* have rejected proposed units consisting of a single job classification. *See, e.g.*, *Golden State Overnight Delivery Serv., Inc.*, Decision and Order, 31-RC-185685 (Nov. 4, 2016); *PHS/MWA Aviation Servs.*, Decision and Order, 21-RC-184349 (Oct. 20, 2016).

Insofar as Rhino contends that the Board's "overwhelming community of interest" standard inappropriately gives dispositive weight to "the extent to which the employees have organized," 29 U.S.C. § 159(c)(5), Rhino's argument is misconceived. As we explained in *Blue Man Vegas*, the Board "does not . . . give[] controlling weight" to the extent of employees' organization "[a]s long as [it] applies the overwhelming community-of-interest standard only after the proposed unit has been shown to be *prima facie* appropriate." 529 F.3d at 423. The Board did just that here.

We also reject Rhino's claim that *Specialty Healthcare* disserves the interests of both employers and employees, thereby contravening the NLRA's core purpose of facilitating collective bargaining. Rhino's argument to that effect amounts to a policy preference, one not dictated by any particular understanding of the statutory term "appropriate." And the argument ultimately is a manifestation of Rhino's undue skepticism that the Board could ever find a proposed unit to be inappropriately underinclusive.

Rhino likewise errs in contending that the NLRA on balance favors marginally larger bargaining units. The Supreme Court has recognized the virtues of a contrary vision: "A cohesive unit—one relatively free of conflicts of interest—serves the Act's purpose of effective collective bargaining, and prevents a minority interest group from being

submerged in an overly large unit." *NLRB v. Action Auto., Inc.*, 469 U.S. 490, 494 (1985) (citations omitted). And the NLRA expressly contemplates the possibility of sensible fragmentation, establishing that "the unit appropriate for the purposes of collective bargaining [may] be the employer unit, craft unit, plant unit, *or subdivision thereof.*" 29 U.S.C. § 159(b) (emphasis added). Section 9 thus confers discretion on the Board to accommodate competing visions of workplace organization.

Lastly, the Board, contrary to Rhino's argument, did not violate the APA by announcing a new substantive standard via adjudication rather than notice-and-comment rulemaking. First, *Specialty Healthcare*, as explained, clarified the precise verbiage the Board would apply in unit-determination cases; it did not establish any new substantive legal test. In any event, even if it had done so, "the Board is not precluded from announcing new principles in an adjudicative proceeding." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974). The Supreme Court has made clear that "the choice between rulemaking and adjudication lies in the first instance within the Board's discretion." *Id.*

B.

With regard to the Board's application of the *Specialty Healthcare* framework in this case, we hold that substantial evidence supports the Board's determination that Rhino's riggers do not share an overwhelming community of interest with the company's other employees. Riggers perform a "unique function"—they "use[] motors to temporarily suspend objects . . . overhead at Employer events." Reg'l Dir.'s Decision and Direction of Election at 3. In light of the associated risks, prospective riggers must attend a three-day training course before Rhino will allow them to assume those

duties. That prerequisite means that "riggers alone perform rigging duties." *Id.* at 5. Riggers also have a "significantly higher hourly wage rate range" than their fellow employees— $20 to $40 per hour, rather than $11 to $20 per hour. *Id.* at 3. Riggers, moreover, receive larger gas reimbursements for certain events. And they "take direction from their own rigger supervisor," who qualifies as a statutory "supervisor" under Section 2(11) of the NLRA. *Id.* at 4. That person meets with all riggers at the start of each call.

Unlike many other Rhino employees, riggers "do not have any responsibility for unloading or loading items," and they "do not generally work during the shows." *Id.* Rather, before events begin, riggers "go[] up into the grid to attach chains to hoist motors in the air." *Id.* at 3. That task requires "unique tools." *Id.* And although riggers are guaranteed four hours of pay for four-hour event calls, they—unlike all other Rhino event workers—may leave before the call ends (i.e., once they have completed their rigging tasks).

To be sure, Rhino has made a case that a bargaining unit consisting of *all* of its employees would have been statutorily "appropriate," as well. But that is not enough to show that the petitioned-for unit is *in*appropriate. What matters instead is that some legitimate basis plainly exists for permitting riggers to form their own unit. The record indicates that the distinctions between riggers and other Rhino employees— concerning wages, hours, training, supervision, equipment, and physical working conditions—are significant. Therefore, the Board "reasonably conclude[d]" that those distinctions sufficiently "differentiate the employment interests" of Rhino's riggers and non-riggers such that riggers may form their own bargaining unit. *Blue Man Vegas*, 529 F.3d at 424.

13

\* \* \* \* \*

For the foregoing reasons, we deny the petition for review and grant the Board's cross-application for enforcement of its order.

*So ordered.*