**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 14-2222**

─────────────

NESTLE DREYER'S ICE CREAM COMPANY,

       Petitioner,

       v.

NATIONAL LABOR RELATIONS BOARD,

       Respondent,

and

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 501, AFL-
CIO,

       Intervenor.

-------------

NATIONAL ASSOCIATION OF MANUFACTURERS; RETAIL LITIGATION
CENTER, INC.; THE CHAMBER OF COMMERCE OF THE UNITED STATES
OF AMERICA; COALITION FOR A DEMOCRATIC WORKPLACE;
INTERNATIONAL FOODSERVICE DISTRIBUTORS ASSOCIATION; NATIONAL
ASSOCIATION OF WHOLESALER-DISTRIBUTORS; NATIONAL COUNCIL OF
CHAIN RESTAURANTS; NATIONAL FEDERATION OF INDEPENDENT
BUSINESS; NATIONAL RETAIL FEDERATION; SOCIETY FOR HUMAN
RESOURCE MANAGEMENT,

       Amicus Curiae.

─────────────

**No. 14-2339**

─────────────

NATIONAL LABOR RELATIONS BOARD,

       Petitioner,

v.

NESTLE DREYER'S ICE CREAM COMPANY,

        Respondent.

-------------

NATIONAL ASSOCIATION OF MANUFACTURERS; RETAIL LITIGATION CENTER, INC.; THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; COALITION FOR A DEMOCRATIC WORKPLACE; INTERNATIONAL FOODSERVICE DISTRIBUTORS ASSOCIATION; NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS; NATIONAL COUNCIL OF CHAIN RESTAURANTS; NATIONAL FEDERATION OF INDEPENDENT BUSINESS; NATIONAL RETAIL FEDERATION; SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

        Amicus Curiae.

On Petition for Review of an Order of the National Labor Relations Board. (31-CA-74297)

Argued: October 28, 2015        Decided: April 26, 2016

Before SHEDD, DIAZ, and HARRIS, Circuit Judges.

Petition for review denied and cross-petition for enforcement granted by published opinion. Judge Diaz wrote the opinion, in which Judge Shedd and Judge Harris joined.

**ARGUED:** Bernard J. Bobber, FOLEY & LARDNER LLP, Milwaukee, Wisconsin, for Petitioner/Cross-Respondent. Gregory P. Lauro, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Matthew James Ginsburg, AFL-CIO, Washington, D.C., for Intervenor. **ON BRIEF:** Ryan N. Parsons, FOLEY & LARDNER LLP, Milwaukee, Wisconsin, for Petitioner/Cross-Respondent. Jennifer Abruzzo, Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Jill A. Griffin, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Brian A. Powers, James B. Coppess, Washington, D.C., for Intervenor. Bernard P. Jeweler,

Christopher R. Coxson, Harold P. Coxson, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Washington, D.C.; Linda E. Kelly, Patrick N. Forrest, MANUFACTURERS' CENTER FOR LEGAL ACTION, Washington, D.C., for Amicus The National Association of Manufacturers. Deborah White, RETAIL LITIGATION CENTER, INC., Arlington, Virginia; Jason C. Schwartz, Thomas M. Johnson, Jr., Alexander K. Cox, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Amicus Retail Litigation Center, Inc. Mark Theodore, Los Angeles, California, Ronald Meisburg, Joshua F. Alloy, PROSKAUER ROSE, LLP, Washington, D.C.; Kate Comerford Todd, Steven P. Lehotsky, U.S. CHAMBER LITIGATION CENTER, INC., Washington, D.C., for Amici Coalition for a Democratic Workplace, International Foodservice Distributors Association, National Association of Wholesaler-Distributors, National Council of Chain Restaurants, National Federation of Independent Business, National Retail Federation, Society for Human Resource Management, and The Chamber of Commerce of the United States.

DIAZ, Circuit Judge:

The National Labor Relations Board certified a collective-bargaining unit consisting of all maintenance employees at an ice-cream production facility operated by Nestle-Dreyer's Grand Ice Cream, Inc. Dreyer's contends that (1) the Board applied a legal standard that violated the National Labor Relations Act (the "NLRA") and otherwise represented an abuse of discretion; and (2) under the proper legal standard as well as the incorrect legal standard upon which the Board relied, production employees must be included in the petitioned-for unit. Because the Board did not violate the NLRA or abuse its discretion in certifying the maintenance-only unit, we deny Dreyer's petition for review and grant the Board's cross-petition for enforcement of its order.

I.

A.

At a production facility in Bakersfield, California,[1] Dreyer's manufactures ice-cream products: cartons, cones, bars, and other frozen novelties. Known as the Bakersfield Operations

---

[1] We have jurisdiction because Dreyer's operates a production facility in Maryland. See 29 U.S.C. § 160(f) (permitting "[a]ny person aggrieved by a final order of the Board" to obtain review where the person "resides or transacts business").

Center (the "BOC"), the facility contains a factory with twenty-six production lines, a palletizing area and distribution center, warehouses for dry goods and frozen goods, and a machine shop for making and repairing parts for the production lines. It also houses a research and development center.

At the time relevant to this litigation, the BOC employed about 113 maintenance employees and 578 production employees. Most production employees work on the production lines, operating the manufacturing equipment, stacking the product on pallets, and storing it for distribution. Others work in pre-manufacturing, where they order materials and mix ingredients for the lines. Production employees generally work on a specific production line, and they do not work in the machine shop or the research and development center.

The majority of maintenance employees work on the production lines, where they are assigned to multiple production lines or the adjacent palletizing areas. They perform routine maintenance and as-needed repairs on the manufacturing equipment. The rest of the maintenance employees perform a variety of tasks throughout the BOC. Process technicians, who work in pre-manufacturing, assist with the computer-controlled mixing equipment and troubleshoot problems as they arise. The utilities group maintains the BOC's refrigeration systems, as well as its electrical, heating, plumbing, and ventilation

5

systems. Other maintenance employees work as control technicians, in facilities maintenance, or in the machine shop.

On the production lines and in pre-manufacturing, maintenance and production employees sometimes work together. While production workers are trained to solve minor or routine technical problems—for example, simple packaging jams that can be fixed by removing the jammed material—their technical training is limited, and maintenance workers perform most repairs and routine maintenance. When production employees encounter technical problems they cannot solve, they call for the assistance of a maintenance employee. The maintenance employee diagnoses the problem and performs the repair, relying on input from the production worker. Every third shift, production workers disassemble the equipment for cleaning while maintenance workers stand by to replace broken parts or address problems that may occur during reassembly and start-up.

Maintenance and production employees have similar working conditions. They receive the same employment benefits, annual performance evaluations, and they use the same parking lots, time clocks, break rooms, and lockers. They must also follow the same workplace policies, including wearing similar uniforms.

But the two groups are distinguished in several significant respects. Maintenance workers are generally better paid, receiving $20–$30 an hour, compared with $15–$22 for production

6

workers. This reflects the fact that maintenance employees have significantly more training, particularly in mechanics and electronics. Maintenance employees rarely do the work of production employees, and they work on a different schedule. Whereas maintenance employees work four ten-hour shifts each week, production employees work five eight-hour shifts, which results in different overtime, holiday, and sick pay. Furthermore, the two groups are organized into separate departments with different immediate supervisors. Maintenance employees are part of the Technical Operations Team; production employees are on either the Manufacturing Team or the Pre-Manufacturing Team. Finally, the BOC shuts down annually for two to four weeks for a complete rebuild of the production lines. All maintenance employees are required to work during this period, whereas only a few production employees work if they volunteer or are selected to participate.

Near the end of 2009, Dreyer's put in place a pilot program, limited to one production line, intended to partially integrate the roles of production and maintenance employees. The purpose of the program was to increase production employees' ability to perform routine maintenance (cleaning, inspecting, lubricating), thereby allowing maintenance employees to focus less on breakdowns and more on preventive maintenance. The

7

program was put on hold sometime in 2011 and was restarted in early 2012.

B.

Late in 2011, the International Union of Operating Engineers Local 501, AFL–CIO filed a petition with the Board, seeking to represent the BOC's maintenance employees. Dreyer's objected to the proposed unit, arguing that it should also include production employees. The Board's Regional Director (the "RD") approved the maintenance-only unit over Dreyer's objections, and the Board denied Dreyer's request for review. After maintenance employees voted 56–53 in favor of joining the Union, Dreyer's refused to bargain and the Union filed an unfair-labor-practice charge with the Board.[2]

The Board granted summary judgment to the Union, and Dreyer's sought review in this court. We placed the case in abeyance pending the Supreme Court's decision in NLRB v. Noel Canning, 134 S. Ct. 2550 (2014), which ultimately held that the appointments of some members of the Board were unconstitutional. On the Board's motion, we vacated its order and remanded.

On remand, the Board again found that Dreyer's had committed an unfair labor practice, and Dreyer's again

_____

[2] To challenge the Board's unit determination, "the employer must refuse to bargain, triggering unfair labor practice proceedings under Section 8(a)(5)." Wellman Indus., Inc. v. NLRB, 490 F.2d 427, 430 (4th Cir. 1974).

8

petitioned this court for review.  The Board cross-petitioned for enforcement.

## II.

### A.

The NLRA requires the Board to determine "the unit appropriate for the purposes of collective bargaining."  29 U.S.C. § 159(b).  In making this determination, the Board exercises "the widest possible discretion."  Sandvik Rock Tools, Inc. v. NLRB, 194 F.3d 531, 534 (4th Cir. 1999).  The Board may approve any appropriate unit; it need not identify and select "the single most appropriate unit."  NLRB v. Enter. Leasing Co. Se., 722 F.3d 609, 625 (4th Cir. 2013) (quoting Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 610 (1991)).  Therefore, to resist the Board's determination that a petitioned-for unit is appropriate, an employer cannot merely demonstrate that a different unit is also appropriate, or even more appropriate.  Sandvik, 194 F.3d at 537.  Rather, "[a]n employer challenging the Board's unit determination . . . has the burden to prove that the bargaining unit selected is 'utterly inappropriate.'"  Enter. Leasing, 722 F.3d at 626-27 (quoting Sandvik, 194 F.3d at 534); see also Arcadian Shores, Inc. v. NLRB, 580 F.2d 118, 120 (4th Cir. 1978).

9

But despite granting broad discretion, the NLRA prohibits the Board from blindly deferring to a union's proposed unit. NLRB v. Lundy Packing Co., 68 F.3d 1577, 1580 (4th Cir. 1995). Rather, the NLRA states that "[i]n determining whether a unit is appropriate . . . the extent to which the employees have organized shall not be controlling." 29 U.S.C. § 159(c)(5). This means that the happenstance of a union's organizing efforts may not be the dominant factor in the Board's decision to approve the unit. See Lundy, 68 F.3d at 1580. Because a union will ordinarily propose a unit controlled by organized employees, the Board violates the statute if it presumes the appropriateness of a proposed unit. See id. at 1581. Nevertheless, the Board may consider the extent of organization as one relevant factor, which may even be the "determinative" factor in a "close case." Overnite Transp. Co. v. NLRB, 294 F.3d 615, 620 (4th Cir. 2002).

To guide its discretion, and to avoid giving controlling weight to the extent of organization, the Board has traditionally asked whether "employees in the requested unit shar[e] a sufficient community of interest to be included in the same unit." Overnite Transp. Co., 322 N.L.R.B. 723, 725 (1996). The community-of-interest test incorporates several factors:

> (1) similarity in the scale and manner of determining the earnings; (2) similarity in employment benefits, hours of work, and other terms and conditions of

10

> employment; (3) similarity in the kind of work performed; (4) similarity in the qualifications, skills and training of the employees; (5) frequency of contact or interchange among the employees; (6) geographic proximity; (7) continuity or integration of production processes; (8) common supervision and determination of labor-relations policy; (9) relationship to the administrative organization of the employer; (10) history of collective bargaining; (11) desires of the affected employees; [and] (12) extent of union organization.

Enter. Leasing, 722 F.3d at 626 n.8 (quoting Lundy, 68 F.3d at 1580). The test ensures not only that the employees in the unit share common interests, but also that these interests are distinct from those of excluded employees. See Newton-Wellesley Hosp., 250 N.L.R.B. 409, 411 (1980).

In Specialty Healthcare & Rehabilitation Center of Mobile, 357 N.L.R.B. No. 83 (2011), the Board set out to clarify this longstanding unit-determination analysis. The Board explained that the analysis proceeds in two steps. In step one, "the Board examines the petitioned-for unit . . . . If that unit is an appropriate unit, the Board proceeds no further." Id. at *12. In essence, this is the traditional community-of-interest test outlined above. See id. at *14 (examining the community-of-interest factors to determine that the included employees "share a community of interest" and "are unlike all the other employees the Employer would include in the unit"). Once the Board determines in step one that the members of the proposed unit share a community of interest—and the unit is thus

11

appropriate—the burden then shifts to the employer to show that the approved unit is inappropriate.  Id. at *15.

In step two, the employer "is required to demonstrate that a proposed unit consisting of employees readily identifiable as a group who share a community of interest is nevertheless not an appropriate unit because the smallest appropriate unit contains additional employees."  Id.  The employer's required showing is necessarily "heightened": because the Board need not select the most appropriate unit, the employer must do more than show that its preferred unit is also appropriate.  Id. at *16.

The Board acknowledged in Specialty Healthcare that it and the courts of appeals had over time used "different words . . . to describe this heightened showing," and it concluded that the use of "slightly varying verbal formulations . . . [did] not serve the statutory purpose" of the NLRA.  Id. at *16-17. Accordingly, to describe the employer's required showing when asking the Board to include additional employees in the unit, the Board settled on a phrase accepted by the D.C. Circuit: "an overwhelming community of interest."  Id. at *16 (quoting Blue Man Vegas, LLC v. NLRB, 529 F.3d 417, 421 (D.C. Cir. 2008)).

To summarize the Specialty Healthcare framework: in step one, the Board performs a community-of-interest analysis to determine whether the proposed unit is appropriate; if the unit is found appropriate, in step two the employer must demonstrate

12

that the excluded employees it wishes to include share an "overwhelming community of interest" with the included employees. Id. (emphasis added).

B.

We hold that the Board acted within its broad discretion in certifying the Union's petitioned-for unit. After a thorough analysis of the facts, the RD applied the traditional community-of-interest factors to determine not only that the maintenance employees share a community of interest amongst themselves, but also that maintenance employees form a group distinct from production employees. By doing so, the RD did not allow the extent of organization to control his decision.

In applying the Specialty Healthcare framework, the RD began by determining that the maintenance employees are "readily identifiable as a separate group" from production employees. J.A. 416. Maintenance employees "are in their own department, and are in different job classifications, have different skills, and perform different functions from production employees." Id. The RD focused in particular on the "very different skills" of the two employee groups and on the fact that maintenance employees have "much more technical knowledge" than production employees. Id. Specifically, maintenance employees "are required to have one year['s] experience in computerized maintenance management, two years['] experience in

13

troubleshooting pneumatics, hydraulics, and electrical and manufacturing, and five to seven years['] experience in industrial high speed maintenance." Id. None of these requirements apply to production employees. Id. And whereas "[m]aintenance mechanics spend about 90% of their time performing skilled maintenance work," "production employees lack the appropriate skill" for such work and make only "minor adjustment[s] or repair[s]." J.A. 416-17.

Having distinguished maintenance and production employees, the RD next determined that "[t]he maintenance employees share a sufficient community of interest amongst themselves for purposes of collective bargaining." J.A. 417. Applying the traditional community-of-interest factors, he determined that the maintenance employees share similar wages, similar hours, common supervision, and common functions. J.A. 418-19.

Throughout this analysis, the RD continued to note how maintenance employees are distinct from production employees. He found that "[t]he greater skill of the maintenance employees is . . . reflected by the fact that the maintenance employees are significantly higher paid than the production employees" and that "there is virtually no temporary interchange between maintenance and production employees." J.A. 419-20. Moreover, any overlap in wages of the two groups is limited to one of five classes of maintenance employees and is ultimately

14

"insignificant." J.A. 418. The two groups work different shifts, the RD found, and as a result, "[o]vertime is calculated differently for maintenance employees than production employees," "maintenance employees tend to work more overtime than production [employees]," and maintenance employees receive more hours of sick pay than production employees. Id. The two groups' essential functions also differ: "The maintenance employees are primarily in charge of maintaining the Employer's machinery, and the production employees are primarily in charge of producing the ice cream." J.A. 419. And while many maintenance employees "come into contact with production employees on the production lines," some maintenance employees who do not work on the lines have "more limited" or "very little contact" with production employees. J.A. 420.

Moving on to step two of the Specialty Healthcare analysis, the RD found that Dreyer's could not meet its burden to show that the production and maintenance employees share an overwhelming community of interest. J.A. 420–21. He rejected several of Dreyer's arguments. First, he found distinguishable prior Board cases approving joint units of production and maintenance employees. J.A. 421 (citing Buckhorn, Inc., 343 N.L.R.B. 201 (2004); TDK Ferrites Corp., 342 N.L.R.B. 1006 (2004)). Second, he found that the petitioned-for unit is not arbitrary or fractured because the Union sought "to represent

15

all classifications of the Employer's maintenance employees." Id. Third, he found the bargaining history at the facility inconclusive. Id. And finally, the RD gave "little weight" to Dreyer's argument that its pilot program for increasing the integration of the production and maintenance employees' work renders the unit inappropriate. J.A. 422. The success of the program remained speculative, he found, and even assuming its success, the program would not close the significant gap in skill between the two groups. Id.

By properly applying the community-of-interest factors before shifting the burden to Dreyer's, the RD appropriately exercised his discretion and did not permit the extent of organization to control. Cf. FedEx Freight, Inc. v. NLRB, No. 15-1848, 2016 WL 859971, at *7 (8th Cir. Mar. 7, 2016) (published) (holding that "the use of an overwhelming community of interest test at the second step of the Board's analysis does not violate section 9(c)(5)"); Kindred Nursing Ctrs. E., LLC v. NLRB, 727 F.3d 552, 565 (6th Cir. 2013) (enforcing the Board's order in Specialty Healthcare); Blue Man, 529 F.3d at 423 ("As long as the Board applies the overwhelming community-of-interest standard only after the proposed unit has been shown to be prima facie appropriate, the Board does not run afoul of the statutory injunction that the extent of the union's organization not be given controlling weight.").

16

This conclusion is supported by the fact that the approved unit tracks Dreyer's own departmental lines and is consistent with prior Board unit determinations. See, e.g., Ore-Ida Foods, Inc., 313 N.L.R.B. 1016, 1020 (1994) (finding that maintenance employees shared a community of interest distinct from production workers because of differences in skill and compensation, despite "extensive contact with, and, at times the assistance of, the production employees"). And it is of no consequence that a unit including production employees may also be appropriate. See J.A. 421 (RD noting that "factors [Dreyer's] points to might show that a combined unit is an appropriate unit"). Dreyer's burden is to show that the approved unit is "utterly inappropriate." Enter. Leasing, 722 F.3d at 626-27. That it cannot do, as we explain in the next section.

## C.

Dreyer's offers several objections, focusing its attack on Specialty Healthcare rather than on the Board's decision in this case.[3] We consider each objection in turn.

---

[3] Dreyer's focus on Specialty Healthcare rather than on the RD's analysis in this case is telling. Indeed, the dissenting member of the Specialty Healthcare panel also participated in this case, and, while he refused to rely on Specialty Healthcare, he nevertheless found here "that, under the traditional community-of-interest test, the interests of the petitioned-for unit are sufficiently distinct from the (Continued)

17

First, Dreyer's contends that the overwhelming-community-of-interest test in Specialty Healthcare violates the NLRA by giving controlling weight to the extent of union organization. For this contention, Dreyer's relies primarily on our decision in Lundy Packing. In Lundy, the Board approved a unit of production and maintenance employees at a pork-products plant, rejecting the employer's argument that industrial engineers and some quality-control employees should also be included. 68 F.3d at 1579. While the Board conceded that the larger unit might also be an appropriate unit, it determined that the excluded employees did not share an "overwhelming community of interest" with those in the proposed unit. Id. at 1581. The Board therefore denied the employer's request to include additional employees. Id. at 1579.

We denied enforcement of the Board's order, finding several problems with the decision. First, the Board permitted the exclusion of some employees on the basis of "meager differences," which was "problematic under the 'community of interest' standard." Id. at 1581. Second, the Board "adopted a

production employees." J.A. 426. And at oral argument, counsel for Dreyer's conceded that the RD's community-of-interest analysis "looks a lot like the . . . historical analysis that used to be done." Oral Argument at 14:15, Nestle Dreyer's Ice Cream Co. v. NLRB, 14-2222 (Oct. 28, 2015), http://coop.ca4.uscourts.gov/OAarchive/mp3/14-2222-20151028.mp3.

novel legal standard which effectively accomplished the exclusion. Under this new standard, any union-proposed unit is presumed appropriate unless an 'overwhelming community of interest' exists between the excluded employees and the union-proposed unit." Id. We held that this use of the overwhelming-community-of-interest standard, which presumed the appropriateness of a proposed bargaining unit, "effectively accorded controlling weight to the extent of union organization" in violation of the NLRA. Id.

According to Dreyer's, Lundy held that the overwhelming-community-of-interest test necessarily violates the NLRA when used in the context of unit determinations: "Instead of using a range of factors to determine whether a proposed unit is appropriate, as the Board did with its traditional [community-of-interest] test, the overwhelming test skews the analysis 'overwhelmingly' in favor of the union-proposed unit." Pet'r's Br. at 41.

Dreyer's reads Lundy too broadly. Lundy does not establish that the overwhelming-community-of-interest test as later applied in Specialty Healthcare fails to comport with the NLRA. Instead, Lundy prohibits the overwhelming-community-of-interest test where the Board first conducts a deficient community-of-interest analysis—that is, where the first step of the Specialty Healthcare test fails to guard against arbitrary exclusions.

19

The "meager differences" we identified in Lundy between the excluded quality-control employees and the included production and maintenance employees were the following: "(1) the method for calculating their earnings; (2) supervision; and (3) a lack of interchangeability with other [production and maintenance] positions." Id. at 1580. And even these distinctions were questionable: at least one included employee's pay was calculated in the same manner as the excluded employees, and many of the included employees had different supervisors from one another. Id. at 1580–81. In other words, the petitioned-for unit was an apparent union gerrymander. By rubber-stamping it and then applying the overwhelming-community-of-interest test, "the Board effectively accorded controlling weight to the extent of union organization." Id. at 1581.

But in Lundy we had no occasion to determine whether the overwhelming-community-of-interest test would offend the NLRA in a case where the Board properly conducts Specialty Healthcare's step-one analysis by determining that the members of the petitioned-for unit share a distinct community of interest. With such a case now before us, we find Lundy distinguishable. Here, in addition to the differences cited in Lundy, the RD identified several community-of-interest factors that distinguished maintenance employees from production employees: higher wages, greater training and education requirements,

20

higher skill levels, and different hours.  In Lundy, the Board effectively assumed the proposed-unit employees shared a community of interest; here, in contrast, the Board rigorously weighed the traditional community-of-interest factors to ensure that the proposed unit was proper under the NLRA.

We need not and do not hold that an application of the Specialty Healthcare standard will never run afoul of Lundy. Our assessment of a prior Board policy regarding unit determinations remains applicable here:

> The Board's announced standard may lead to some decisions where the extent of organization will be the dominant factor in unit selection (such as in cases where the community of interest considerations in support of the union's proposed unit are weak), but not all cases will be like that. And that did not happen here, where the Board supported its decision to exclude the [production employees] from the . . . unit with numerous community of interest factors.

Overnite Transp., 294 F.3d at 621 (addressing the Board's policy of considering "only whether the unit requested [by the union] is an appropriate one, even though it may not be the most optimum or most appropriate unit").  At least on the facts before us, the imposition of the overwhelming-community-of-interest test did not give controlling weight to the extent of union organization, unlike in Lundy.

Next, Dreyer's contends that the Board in Specialty Healthcare failed to provide a reasoned explanation for its adoption of the overwhelming-community-of-interest test, which

21

resulted in a "repudiation of more than forty years of precedent." Pet'r's Br. at 44. Dreyer's overstates the changes the Board made in Specialty Healthcare. Indeed, we agree with our sister circuits that the Board clarified—rather than overhauled—its unit-determination analysis. See FedEx, 2016 WL 859971, at *7 ("We conclude that the overwhelming community of interest standard articulated in Specialty Healthcare is not a material departure from past precedent . . . ."); Kindred, 727 F.3d at 561 ("The Board has used the overwhelming-community-of-interest standard before, so its adoption in Specialty Healthcare . . . is not new."); Blue Man, 529 F.3d at 421 (describing the Board's "consistent analytic framework" as including the question whether "the excluded employees share an overwhelming community of interest with the included employees").

We acknowledge that some statements in Specialty Healthcare may be read to indicate significant changes in Board policy. For example, some passages suggest that whether employees are appropriately excluded from the petitioned-for unit is addressed only in step two, the overwhelming-community-of-interest analysis, not in step one, the traditional community-of-interest analysis. Specialty Healthcare, 357 N.L.R.B. No. 83, at *26 (Hayes, dissenting); see also id. at *17 (majority opinion). This would indeed constitute a significant change, as it would

22

mean that the Board no longer determines for itself whether employees are arbitrarily excluded from the petitioned-for unit. Applying Specialty Healthcare in such a manner might well conflict with Lundy, which requires that before the overwhelming-community-of-interest test is applied, the Board at the very least must ensure that employees are not excluded on the basis of "meager differences." Lundy, 68 F.3d at 1581.

The RD's application of Specialty Healthcare here, however, is entirely consistent with our precedent. The analysis of the proposed unit did not "address[], solely and in isolation, the question whether the employees in the unit sought have interests in common with one another." Newton-Wellesley Hosp., 250 N.L.R.B. at 411. Instead, the analysis "proceed[ed] to a further determination whether the interests of the group sought [were] sufficiently distinct from those of other employees to warrant the establishment of a separate unit." Id. This was a proper application of the well-worn community-of-interest test, and it represented a finding that the petitioned-for unit was appropriate. At that point, a challenge to the unit faced a high burden. In our words, the unit had to be proven "utterly inappropriate"; in the Board's newly chosen words, the excluded employees had to share an overwhelming community of interest with those in the unit. These standards are entirely consistent.

23

Nor is it unreasonable, as Dreyer's urges, for the Board to use the same overwhelming-community-of-interest test in this context that it has historically used in the context of accretions. In an accretion, new employees become part of an existing bargaining unit without taking part in a representative election. Lundy, 68 F.3d at 1581. Because these employees lack the opportunity to vote, the Board will not permit their addition to a unit unless they share an overwhelming community of interest with the unit. Id. As we explained in Lundy, the Board may not import this test to determine whether a petitioned-for unit is appropriate. Id. at 1582. The proper analysis for that determination is the community-of-interest test. But in determining whether the Board's approved unit is "utterly inappropriate," the overwhelming-community-of-interest test is reasonable. As in the accretion context, the question is whether some employees share more than a community of interest with the members of the unit.

Moreover, to the extent the Board in Specialty Healthcare departed from its prior precedent, it provided enough explanation so that a reviewing court could understand what changes the Board intended to make and why. See J.P. Stevens & Co. v. NLRB, 623 F.2d 322, 329 (4th Cir. 1980) (determining that the Board had not sufficiently explained itself where it was "difficult to ascertain . . . why the Board apparently departed

24

from its precedents"). Specifically, the Board explained that the overwhelming-community-of-interest test, though somewhat new in name, was consistent with the Board's prior precedent and with the precedent of the courts of appeals, and that using varying terminology did not serve the purposes of the NLRA. Specialty Healthcare, 357 N.L.R.B. No. 83, at *16-17. This was a sufficient explanation for our review. Because the Board did not significantly alter its prior rulings in Specialty Healthcare, and because it reasonably explained the changes it was making, the Board did not abuse its discretion.

Finally, Dreyer's argues that in Specialty Healthcare, "the Board exceeded the reasonable boundaries of the adjudicative process and abused its discretion," in violation of the Administrative Procedure Act. Pet'r's Br. at 59. This appears to encompass two sub-arguments: first, Specialty Healthcare changed the law so significantly that rulemaking rather than adjudication was required; second, whether to adopt the overwhelming-community-of-interest test was not before the Board in Specialty Healthcare, so the Board was announcing a rule without either proper adjudication or rulemaking. Both arguments lack merit.

Ordinarily, the Board may adopt new regulatory principles through adjudication rather than rulemaking. NLRB v. Bell Aerospace Co. Div. of Textron, 416 U.S. 267, 294 (1974).

However, courts have sometimes found the choice of adjudication inappropriate where an agency purports to establish a new rule of widespread application. See Ford Motor Co. v. FTC, 673 F.2d 1008, 1009 (9th Cir. 1981). In Ford, for example, the FTC was required to proceed by rulemaking rather than adjudication when it created a rule that "would require a secured creditor to credit the debtor with the 'best possible' value of [a] repossessed vehicle, and forbid the creditor from charging the debtor with overhead and lost profits." Id.

In Specialty Healthcare, by contrast, the Board did not create a new obligation for employers in operating their businesses. Rather, the Board merely clarified the employer's evidentiary burden when it challenges a union's proposed bargaining unit in the course of an adjudication. Such a clarification of agency law through adjudication is hardly the kind of abuse of discretion the Ninth Circuit identified in Ford. See FedEx, 2016 WL 859971, at *8 (holding that "the Board's decision to proceed by adjudication was not an abuse of discretion"); cf. Bell Aerospace, 416 U.S. at 295 (finding that rulemaking was not required for the Board to change course from prior decisions, when industry reliance on past decisions would not result in "substantial" adverse consequences).

We also reject Dreyer's contention that the issue of whether to adopt the overwhelming-community-of-interest test was

26

not before the Board in <u>Specialty Healthcare</u>.  Although the parties did not raise the question of what standard should apply, the employer was asking the Board to include additional employees in a proposed bargaining unit.  <u>Specialty Healthcare</u>, 357 N.L.R.B. No. 83, at *2.  The Board was free to clarify the applicable standard.  <u>See</u> <u>Bell Aerospace</u>, 416 U.S. at 294 ("[T]he Board is not precluded from announcing new principles in an adjudicative proceeding . . . .").

We therefore conclude that the Board did not violate the Administrative Procedure Act.


### III.

For the reasons stated, we deny Dreyer's petition for review and grant the Board's cross-petition for enforcement.

<u>PETITION FOR REVIEW DENIED AND CROSS-PETITION FOR ENFORCEMENT GRANTED</u>

27