# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1848

_____

FedEx Freight, Inc.

*Petitioner*

v.

National Labor Relations Board

*Respondent*

International Brotherhood of Teamsters, Local 71

*Intervenor*

_____

No. 15-1999

_____

FedEx Freight, Inc.

*Respondent*

v.

National Labor Relations Board

*Petitioner*

International Brotherhood of Teamsters, Local 71

*Intervenor*

_____

No. 15-2494
_____

FedEx Freight

*Petitioner*

v.

National Labor Relations Board

*Respondent*

International Brotherhood of Teamsters, Local 107

*Intervenor*
_____

No. 15-2732
_____

FedEx Freight

*Respondent*

v.

National Labor Relations Board

*Petitioner*

International Brotherhood of Teamsters, Local 107

*Intervenor*

———————

National Labor Relations Board

———————

Submitted: January 12, 2016
Filed: March 7, 2016

———————

Before MURPHY, SMITH, and BENTON, Circuit Judges.

———————

MURPHY, Circuit Judge.

The International Brotherhood of Teamsters locals in Charlotte, North Carolina and Croydon, Pennsylvania petitioned the National Labor Relations Board (NLRB) seeking to represent collective bargaining units including both city and road drivers who work at terminals operated by FedEx Freight, Inc. FedEx proposed that the units should also include the dockworkers at the terminals. In considering the proposal the NLRB regional director applied a two step analysis from Specialty Healthcare and Rehabilitation Center of Mobile, 357 NLRB No. 83 (2011). In each case the director found that (1) the union's proposed bargaining unit was composed of a readily identifiable group of employees sharing a community of interest, and (2) FedEx did not meet its burden to show that the dockworkers shared an "overwhelming community of interest" with the drivers which required their inclusion in the same unit. The Board denied review, and the Teamsters won the elections in both cities.

FedEx now petitions for review of the Board's orders forcing it to bargain with the unions, arguing that the Specialty Healthcare standard violates the National Labor Relations Act, our own circuit law, and the Administrative Procedure Act. The Board petitions for enforcement of its orders. After full consideration, we deny the FedEx petitions and grant the Board's petitions for enforcement.

-3-

# I.

FedEx operates freight terminals across the country. The terminal in Charlotte, North Carolina includes a main building containing a dock with 224 operational doors surrounded by a yard. FedEx employs approximately 115 city drivers, 106 road drivers, and 186 dockworkers at this terminal. The city drivers pick up and deliver freight to and from customers in the area while the road drivers transport freight between the terminal and other FedEx facilities. All these drivers are employed full time and must possess a commercial driver license and wear a uniform while driving. FedEx maintains separate seniority lists for each class of driver. While city drivers occasionally do road driving, road drivers rarely do city driving.

The dockworkers load and unload freight from the trailers and move freight around the dock using forklifts. This work takes place exclusively at the terminal. One hundred and fourteen of the 186 dockworkers are "supplemental" part time employees and are not on a seniority list. The other 72 dockworkers work full time. These individuals are part of a one year "dock to driver" program in which they work full time on the dock while taking a course to obtain their commercial driver license. Eighteen of the 221 drivers are graduates of this program. The full time dockworkers have a seniority list. The only requirement for employment as a dockworker is being at least 18 years of age; they are not required to wear uniforms.

Around one quarter of the drivers performed some dock work during the six month period surveyed in the stipulated record. City drivers also occasionally perform "hostling" work, which involves moving trailers and other equipment around the yard. Road drivers rarely do hostling work. Dock and hostling work take up a total of around 5% of the city drivers' time and less than 1% of the road drivers' time. Although dockworkers do not do any driving work, they use specialized trucks that do not require a commercial driver license to perform hostling work.

The terminal in Croydon, Pennsylvania (referred to as the East Philadelphia terminal) is smaller than the one in Charlotte, having only 51 operational doors. FedEx employs about 29 city drivers, 14 road drivers, and 19 part time supplemental dockworkers in East Philadelphia. Seven of these drivers are graduates of the dock to driver program. In comparison to the Charlotte terminal, more of the East Philadelphia dock work is done by drivers. Approximately 34% of the dock and hostling hours there are worked by drivers. Forty one of the 43 drivers performed dock or hostling work, and 13 of the drivers performed over 100 hours of dock work in six months.

The Teamsters locals in both cities petitioned the Board to represent bargaining units for both the city drivers and the road drivers. FedEx contended that such units were inappropriate because they did not include the dockworkers. After hearings, the NLRB regional director employed the Specialty Healthcare two step analysis and found that the proposed units were appropriate but that FedEx had not met its burden to show the dockworkers must be included in these units. FedEx filed requests for review of the regional director's decisions which the Board summarily denied. After the drivers in both cities voted to unionize, FedEx contested the certification of the bargaining units by refusing to bargain. See NLRB v. St. Clair Die Casting, LLC, 423 F.3d 843, 848 (8th Cir. 2005). The Board's general counsel filed refusal to bargain complaints against FedEx, and the Board granted the general counsel's motions for summary judgment and ordered FedEx to bargain with the unions. Now before us are petitions for review by FedEx and for enforcement by the Board. We have jurisdiction over the matter under 29 U.S.C. § 160(e), (f) because FedEx transacts business in this circuit.[1]

---

[1]FedEx has also filed a petition for review raising the same issues as here in a case about driver unionization at its terminal in Monmouth Junction, New Jersey. FedEx Freight, Inc. v. NLRB, No. 15-2712 (3d Cir. filed July 16, 2015).

II.

The first question raised is whether FedEx preserved its challenges to the Specialty Healthcare framework. The Board argues that in the proceedings below FedEx failed to raise and preserve an argument against Specialty Healthcare. An objection to a Board decision cannot be heard unless it has been "urged before the Board, its member, agent, or agency" such that the Board has "received adequate notice of the basis for the objection." Nathan Katz Realty, LLC v. NLRB, 251 F.3d 981, 985 (D.C. Cir. 2001); 29 U.S.C. § 160(e).

FedEx stated in a footnote in each of its requests for review of the determinations by the regional director that "Specialty Healthcare was decided erroneously" for the reasons stated in Board member Hayes' dissent. See 357 NLRB No. 83 at *15 (Hayes, dissenting). FedEx indicated that it would focus its briefing assuming that the Board would not revisit its decision. FedEx later incorporated its arguments in its responses to the Board's show cause orders in the refusal to bargain cases. The Board was aware of the FedEx challenge to Specialty Healthcare, as shown by member Johnson's concurring statements attached to the two summary affirmance orders by the Board. By adopting member Hayes' dissent, FedEx signaled that it might bring a challenge to the Specialty Healthcare framework if the Board were to apply it. This gave the Board adequate notice that FedEx was objecting to the regional director's use of the Specialty Healthcare framework. We therefore have jurisdiction to review the FedEx claims. See Nathan Katz Realty, 251 F.3d at 985.

III.

The central question here is whether the Board's Specialty Healthcare analysis comports with the National Labor Relations Act (the Act), our own case law applying the Act, and the Administrative Procedure Act (the APA). Section 9 of the Act "gives the Board the power to determine the unit appropriate for the purpose of collective

bargaining." NLRB v. St. Clair Die Casting, LLC, 423 F.3d 843, 848 (8th Cir. 2005). Review of the Board's certification decision "is limited to a determination of whether the decision is arbitrary, capricious, an abuse of discretion, or lacking in substantial evidentiary support." Id. The Board's interpretations of the Act are also "entitled to considerable deference." St. John's Mercy Health Sys. v. NLRB, 436 F.3d 843, 846 (8th Cir. 2006) (quoting Ford Motor Co. v. NLRB, 441 U.S. 488, 495 (1979)).

Section 9(a) of the Act provides for the designation or selection of an exclusive representative for the purposes of collective bargaining "by the majority of the employees in a unit appropriate for such purposes." 29 U.S.C. § 159(a). Section 9(b) requires the Board to "decide in each case" which unit of employees is appropriate. Id. § 159(b). To make that determination, the Board applies a "community of interests" analysis. Cedar Valley Corp. v. NLRB, 977 F.2d 1211, 1217 (8th Cir. 1992). The relevant factors in that analysis include "bargaining history, operational integration, geographic proximity, common supervisor, similarity in job function, and employee interchange." Id. (quoting Elec. Data Sys. Corp. v. NLRB, 938 F.2d 570, 573 (5th Cir. 1991)). The Board has "broad discretion to determine whether a group of employees has a sufficient 'community of interest.'" NLRB v. MEMC Elec. Materials, Inc., 363 F.3d 705, 707 (8th Cir. 2004). On appeal, "the NLRB's determination as to the appropriateness of a bargaining unit will rarely be disturbed and this court's scope of review is narrow." Cedar Valley Corp., 977 F.2d at 1218.

In Specialty Healthcare, the Board reviewed its standards for making unit determinations. The Board explained that it begins by examining the unit sought by the union. 357 NLRB No. 83 at *8. The Board determines whether the proposed unit is appropriate because it consists of employees who are "readily identifiable as a group (based on job classifications, departments, functions, work locations, skills, or similar factors)" and who "share a community of interest after considering the traditional criteria." Id. at *9, 12.

-7-

Next, the Board described what would be required "to demonstrate that a proposed unit consisting of employees readily identifiable as a group who share a community of interest is nevertheless <u>not</u> an appropriate unit because the smallest appropriate unit contains additional employees." <u>Specialty Healthcare</u>, 357 NLRB No. 83 at \*10 (emphasis in original). Merely showing that another unit is appropriate or even more appropriate than the proposed unit "is not sufficient." <u>Id.</u> Thus, when the proposed unit is shown to be prima facie appropriate under the community of interest test, a "heightened showing" by the party opposing the proposed unit is required. <u>Id.</u> at \*11. The party favoring the larger unit must demonstrate "that employees in the larger unit share an overwhelming community of interest with those in the petitioned-for unit." <u>Id.</u> at 12–13.

On appeal, the Sixth Circuit enforced the Board's decision in <u>Kindred Nursing Ctrs. E., LLC v. NLRB</u>, 727 F.3d 552, 554 (2013). The court concluded that the overwhelming community of interest test was not a material change in the Board's section 9 jurisprudence, because the Board had used the standard before. <u>Id.</u> at 561. The court also noted that the same overwhelming community of interest test had been approved by the D.C. Circuit in <u>Blue Man Vegas, LLC v. NLRB</u>, 529 F.3d 417 (D.C. Cir. 2008). In <u>Kindred Nursing</u> the Sixth Circuit also rejected the employer's argument that the <u>Specialty Healthcare</u> framework violated the Act "by making it impossible for an employer to challenge the petitioned-for unit." 727 F.3d at 563–64. The court also concluded that the Board had not violated the Administrative Procedure Act. <u>Id.</u> at 565.

## A.

The <u>Specialty Healthcare</u> decision comports with section 9(b) of the Act and our cases interpreting that statute. In the first step, the Board evaluates whether the employees in the proposed unit are "readily identifiable as a group" and "share a community of interest." 357 NLRB No. 83 at \*12. The Board applies the "traditional

criteria" for determining whether the employees share a community of interest. Id. It has also listed a number of factors it uses to determine whether a community of interest exists:

> [W]hether the employees are organized into a separate department; have distinct skills and training; have distinct job functions and perform distinct work, including inquiry into the amount and type of job overlap between classifications; are functionally integrated with the Employer's other employees; have frequent contact with other employees; interchange with other employees; have distinct terms and conditions of employment; and are separately supervised.

Id. at *9 (quoting United Operations, Inc., 338 NLRB 123, 123 (2002)). These factors parallel our previous description of the community of interest test. Cedar Valley Corp., 977 F.2d at 1217. The Specialty Healthcare framework thus begins by applying the same test we have approved.

FedEx contends that Specialty Healthcare is a departure from precedent because it examines the proposed unit in isolation, but the community of interest test does in fact compare the interests and characteristics of the workers in the proposed unit with those of other workers. The factors listed by the Board question whether the employees in the proposed unit have characteristics that are "distinct" and "separate," and compare the employees to "other employees." 357 NLRB No. 83 at *9; see Blue Man Vegas, 529 F.3d at 421 (the Board looks at the characteristics of the employees in the proposed unit "in distinction from other employees"). The precedents relied on by the Board in Specialty Healthcare make clear that the Board does not look at the proposed unit in isolation. See Wheeling Island Gaming, Inc., 355 NLRB No. 127 at *1 n.2 (2010).

FedEx suggests that the Board must consider other possible units before determining whether the union's proposed unit is appropriate, but nothing in the Act

prohibits the Board from focusing its analysis on the proposed unit. The language of section 9(a) "implies that the initiative in selecting an appropriate unit resides with the employees," and "suggests that employees may seek to organize 'a unit' that is 'appropriate'—not necessarily the single most appropriate unit." Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 610 (1991) (emphasis in original). In our circuit it is a "long-standing principle" of unit determination under the community of interest test that "the Board need only certify 'an appropriate' bargaining unit, rather than 'the most appropriate' one." Watonwan Mem'l Hosp., Inc. v. NLRB, 711 F.2d 848, 850 (8th Cir. 1983) (emphasis in original).[2] The Board explained well before Specialty Healthcare that "[i]n deciding the appropriate unit, the Board first considers the union's petition and whether that unit is appropriate." Overnite Transp. Co., 322 NLRB 723, 723 (1996). If the Board concludes that the petitioned for unit is "an appropriate unit," it has fulfilled the requirements of the Act and need not look to alternative units. See Boeing Co., 337 NLRB 152, 153 (2001). We conclude that the first step in the analysis described by Specialty Healthcare, in which the Board analyzes the union's proposed bargaining unit under the traditional community of interest test, is not a departure from the Board's precedent and is consistent with the requirements of section 9(b) of the Act.

---

[2]This principle has long been applied by the other circuits as well. Friendly Ice Cream Corp. v. NLRB, 705 F.2d 570, 574 (1st Cir. 1983); Staten Island Univ. Hosp. v. NLRB, 24 F.3d 450, 455 (2d Cir. 1994); NLRB v. Saint Francis Coll., 562 F.2d 246, 249 (3d Cir. 1977); Arcadian Shores, Inc. v. NLRB, 580 F.2d 118, 119 (4th Cir. 1978); NLRB v. Bogart Sportswear Mfg. Co., 485 F.2d 1203, 1206 (5th Cir. 1973); NLRB v. First Union Mgmt., Inc., 777 F.2d 330, 333 (6th Cir. 1985); NLRB v. Aaron's Office Furniture Co., 825 F.2d 1167, 1169 (7th Cir. 1987); NLRB v. Mercy Hosps. of Sacramento, Inc., 589 F.2d 968, 972 (9th Cir. 1978); NLRB v. Foodland, Inc., 744 F.2d 735, 737 (10th Cir. 1984); Daylight Grocery Co. v. NLRB, 678 F.2d 905, 908 (11th Cir. 1982); Bentson Contracting Co. v. NLRB, 941 F.2d 1262, 1267 (D.C. Cir. 1991).

FedEx also contends that the "overwhelming community of interest" standard applied in the second step of the Specialty Healthcare analysis is a departure from precedent. The Board has however repeatedly required a heightened showing to challenge a proposed unit found appropriate under the community of interest test. In Engineered Storage Products Co., the Board explained that under this step in the analysis:

> [C]ontrary to the Employer's contentions, the fact that [other employees] may share a community of interest with the petitioned-for employees does not mean that they must be included in the unit or that the petitioned for unit is inappropriate. Rather, the test is whether the community of interest they share with the solely employed employees is so strong that it requires or mandates their inclusion in the unit.

334 NLRB 1063, 1063 (2001) (emphasis added). In Laneco Construction Systems, Inc., the Board rejected the employer's argument that certain other employees "shared such an overwhelming community of interests" with the employees in the unit "that a unit excluding the former employees would be inappropriate." 339 NLRB 1048, 1049 (2003); see also Overnite Transp., 322 NLRB at 726 (group of employees "do not share such a close community of interest . . . as would mandate their inclusion") (emphasis in original). Although the Board has used different phrasing to describe its heightened standard, we agree with the Sixth Circuit that the overwhelming community of interest standard "is not new." Kindred Nursing, 727 F.3d at 561; see also Colo. Nat'l Bank of Denver, 204 NLRB 243, 243 (1973) ("substantial community of interest"); Mc-Mor-Han Trucking Co., 166 NLRB 700, 701 (1967) (shared interests "not so significant as to require the inclusion of all the employees in a single unit"); United Rentals, Inc., 341 NLRB 540, 541 (2004) ("overwhelming and undisputed evidence" of shared interests).

The courts have also imposed a heightened standard on parties seeking to show that a group of employees has been improperly excluded from a bargaining unit. Our

court has held that "[t]o set aside a Board certified unit, the employer must show that the designated unit is not appropriate. It is not enough to show that another kind of unit would have been more appropriate." NLRB v. Metal Container Corp., 660 F.2d 1309, 1313 (8th Cir. 1981). Like the Board, our requirement for a heightened showing stems from the Act's requirement that the Board must certify an appropriate bargaining unit. In Arlington Hotel Co. v. NLRB, the union petitioned for a unit consisting of various hotel employees but excluding four categories of employees such as front desk personnel and clerical workers. 712 F.2d 333, 334 (8th Cir. 1983). The hotel contended that the only appropriate bargaining unit included all hotel employees. Id. at 335–36. We upheld the Board's determination: "although the unit found by the Board is not the only possible unit, it is an appropriate unit and that is all that is required." Id. at 336 (citing 29 U.S.C. § 159(a)). The hotel, we concluded, "has not shown that the unit is totally inappropriate or that the Board abused its discretion in designating this unit." Id.; see also NLRB v. Cell Agric. Mfg. Co., 41 F.3d 389, 397 (8th Cir. 1994) (concluding that "overwhelming evidence" showed the certified unit was inappropriate and the record "support[ed] only one plausible conclusion"—that the appropriate bargaining unit needed to include other employees).

Other circuits have also applied a heightened standard. Most instructive is the D.C. Circuit's comprehensive opinion in Blue Man Vegas, LLC v. NLRB, a case decided three years before Specialty Healthcare. 529 F.3d 417 (D.C. Cir. 2008). The court explained that previous decisions by the Board and the courts "generally conform to a consistent analytic framework":

> If the employees in the proposed unit share a community of interest, then the unit is prima facie appropriate. In order successfully to challenge that unit, the employer must do more than show there is another appropriate unit because "more than one appropriate bargaining unit logically can be defined in any particular factual setting." Rather, as the

Board emphasizes, the employer's burden is to show the prima facie appropriate unit is "truly inappropriate."

Id. at 421 (quoting Country Ford Trucks, Inc. v. NLRB, 229 F.3d 1184, 1189 (D.C. Cir. 2000)) (citation omitted).

A unit is truly inappropriate "if, for example, there is no legitimate basis upon which to exclude certain employees from it," such as employees who "share an overwhelming community of interest with the included employees." Id. The Blue Man Vegas "truly inappropriate" standard closely resembles our use of a "totally inappropriate" requirement. See Arlington Hotel, 712 F.2d at 336. Other circuits use the same standard with slight variations of phrasing. Sandvik Rock Tools, Inc. v. NLRB, 194 F.3d 531, 534 (4th Cir. 1999) (employer has the burden to show that the approved bargaining unit is "utterly inappropriate"); Dunbar Armored, Inc. v. NLRB, 186 F.3d 844, 847 (7th Cir. 1999) ("clearly inappropriate"); Friendly Ice Cream Corp. v. NLRB, 705 F.2d 570, 574 (1st Cir. 1983) (same); NLRB v. J.C. Penney Co., 559 F.2d 373, 375 (5th Cir. 1977) ("clearly not appropriate"). The Board's framework is thus consistent with appellate precedent.

In summary, the Specialty Healthcare framework is a reasonable interpretation of how the Board should apply section 9(b) and decide on an appropriate unit, and is therefore an interpretation to which we must defer. St. John's Mercy Health Sys., 436 F.3d at 846. We conclude that the overwhelming community of interest standard articulated in Specialty Healthcare is not a material departure from past precedent and is consistent with the requirements of section 9(b) of the Act.

B.

FedEx next contends that the Specialty Healthcare standard violates section 9(c)(5) of the Act, which states that when the Board is determining an appropriate

-13-

bargaining unit, "the extent to which the employees have organized shall not be controlling." We disagree.

The Supreme Court has stated that the extent of organization may be considered by the Board as one factor in the Board's determination, so long as it is not given controlling weight. NLRB v. Metro. Life Ins. Co., 380 U.S. 438, 442 & n.4 (1965). According to Specialty Healthcare, the Board begins by analyzing whether the union's proposed unit is appropriate using the multifactor community of interest test. 357 NLRB No. 83 at *9. In Kindred Nursing, the Sixth Circuit followed the D.C. Circuit's analysis and concluded that so long as the overwhelming community of interest test is applied "only after the proposed unit has been shown to be prima facie appropriate, the Board does not run afoul of the statutory injunction that the extent of the union's organization not be given controlling weight." 727 F.3d at 565 (emphasis in original) (quoting Blue Man Vegas, 529 F.3d at 423). We agree.

FedEx argues that the Specialty Healthcare framework is foreclosed by NLRB v. Lundy Packing Co., in which the Fourth Circuit rejected the Board's use of a version of the overwhelming community of interest test. 68 F.3d 1577, 1581 (4th Cir. 1995). The Lundy court concluded that the Board violated section 9(c)(5) when it adopted a "novel legal standard" under which "any union-proposed unit is presumed appropriate unless an 'overwhelming community of interest' exists between the excluded employees and the union-proposed unit." Id. By making that presumption, the court reasoned, "the Board effectively accorded controlling weight to the extent of union organization." Id. FedEx contends that Specialty Healthcare similarly stacks the deck against employers, but it "misread[s] the Fourth Circuit's opinion." Blue Man Vegas, 529 F.3d at 423. The Lundy court did not hold that any heightened standard violates section 9(c)(5), and four years after Lundy the Fourth Circuit reiterated that an employer challenging a bargaining unit selected by the Board must show that the unit is "utterly inappropriate." Sandvik Rock Tools, 194 F.3d at 534; see id. at 538 (distinguishing Lundy on its facts). We agree with the D.C. Circuit that

-14-

the use of an overwhelming community of interest test at the second step of the Board's analysis does not violate section 9(c)(5) because the Board "did not presume the union's proposed unit was valid, as it had done in Lundy." Blue Man Vegas, 529 F.3d at 423.

FedEx also argues that Specialty Healthcare violates section 9(c)(5) because it creates an impossible standard, and that in practice the union's choice of a bargaining unit is "sure to prevail." In at least one case however the Board has applied Specialty Healthcare to find that the employer successfully challenged a union's proposed unit. Odwalla, Inc., 357 NLRB No. 132 (2011). In Odwalla, the Board found that certain excluded employees shared an overwhelming community of interest with the employees included in the union's proposed unit. Id. at *5. Quoting Specialty Healthcare, the Board explained that the union had proposed a "fractured" unit consisting of an arbitrary segment of an appropriate unit. Id. There was "no legitimate basis upon which to exclude" the other employees, the Board reasoned, because they shared the relevant community of interest characteristics with the employees in the proposed unit. Id. (quoting Blue Man Vegas, 529 F.3d at 421). Moreover, "none of the traditional bases for drawing unit boundaries," such as classification lines drawn by the employer, supervision, or methods of compensation, supported the union's division of the employees. Id. at *5–6. Courts have demonstrated a willingness to reject bargaining units that are inappropriate. E.g., Cell Agric. Mfg., 41 F.3d at 397. Because the Specialty Healthcare framework does not make the extent of union organization "controlling," we conclude that it does not violate section 9(c)(5) of the Act.

C.

FedEx also contends that the Board violated the APA by announcing the overwhelming community of interest standard in the course of adjudicating Specialty Healthcare rather than by notice and comment rulemaking. The Supreme Court has

held that "the Board is not precluded from announcing new principles in an adjudicative proceeding," and that "the choice between rulemaking and adjudication lies in the first instance within the Board's discretion." NLRB v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267, 294 (1974); Oiciyapi Fed. Credit Union v. Nat'l Credit Union Admin., 936 F.2d 1007, 1010 (8th Cir. 1991). The Board clarified the state of the law in a reasoned opinion that cited its own precedent and relevant appellate decisions. We agree with the Sixth Circuit that the Board's decision to proceed by adjudication was not an abuse of discretion and therefore not a violation of the APA. Kindred Nursing, 727 F.3d at 565.

D.

Having approved of the Specialty Healthcare standard, we next ask whether in this case substantial evidence supported the Board's unit determinations under that standard. See St. Clair Die Casting, 423 F.3d at 848. FedEx has never taken the position that the road and city drivers do not share a community of interest and form an identifiable group. FedEx thus has the burden to show that there is no legitimate basis for excluding dockworkers from the unit because they share an overwhelming community of interest with the drivers. Specialty Healthcare, 357 NLRB No. 83 at *12–13. Keeping in mind the Board's discretion and our deferential standard of review, we conclude that several common sense logical distinctions separate the drivers and the dockworkers.

Most importantly, the drivers and dockworkers are hired to do substantially different jobs. Drivers are required to have a commercial driver license. The qualifications to become a dockworker are minimal. Although drivers occasionally work on the dock, their primary role is to transport freight between the distribution centers and other centers or customers. Moreover, the drivers are all full time employees, whereas all (in East Philadelphia) or a majority (in Charlotte) of the dockworkers are part time. FedEx asserts that the "best evidence of the total

-16-

integration" of the drivers and dockworkers is the amount of dock work performed by drivers. Although the drivers in East Philadelphia perform about one third of the dock work, the more important fact is that dock workers cannot and do not perform driving work for FedEx. These differences support the Board's determination that the dockworkers do not share an overwhelming community of interest with the drivers. We conclude that the Board's decisions to certify bargaining units consisting of the road and city drivers were supported by substantial evidence and were not arbitrary, capricious, or an abuse of discretion.

IV.

For these reasons we deny FedEx's petitions for review and grant the Board's petitions for enforcement.

_____