OPINION
SCIRICA, Circuit Judge
The National Labor Relations Board certified a collective-bargaining unit comprised of FedEx Freight, Inc. drivers at FedEx’s South Brunswick Terminal in Monmouth Junction, New Jersey. To test the appropriateness of the unit, FedEx refused to bargain with the unit’s certified bargaining representative, Local 701, contending the terminal’s dockworkers must aiso be included in the unit.[1] The Regional Director issued an unfair labor practices order against FedEx, and the Board granted summary judgment in favor of the union. FedEx filed a petition for review, contending the Board (having adopted the Regional Director’s reasoning) abused its discretion in certifying the unit because it applied a unit-determination standard from Specialty Healthcare & Rehabilitation Center, 357 N.L.R.B. No. 83 (2011), enforced sub nom. Kindred Nursing Centers East, LLC v. NLRB, 727 F.3d 552 (6th Cir. 2013). It contends this decision violated Board precedent, the National Labor Relations Act, and the Administrative Procedure Act. Alternatively, FedEx contends that even if the Specialty Healthcare standard applies, the Board abused its discretion by failing to properly apply it here.[2]
Because the Board’s interpretation of the legal standard to apply in unit-determination cases in Specialty Healthcare was reasonable, and the Board properly applied that standard here, we will deny the petition for review and grant the Board’s cross-petition for enforcement of its order to bargain.
L
FedEx provides pick-up and delivery services to customers throughout the United States and has a service center, or “terminal” — the South Brunswick Terminal — in Monmouth Junction, New Jersey. This terminal has an administrative building and a dock where freight is loaded and unloaded onto FedEx trucks by FedEx dockworkers. There is also a yard sur *436 rounding the office building and dock where these dockworkers move and store vehicles and equipment.
The FedEx employees at issue here are city and road drivers and dockworkers.[3] City drivers transport freight locally, and road drivers transport freight over longer distances. The petitioned-for unit is comprised of all drivers, both city and road, but excludes all dockworkers. FedEx’s South Brunswick Terminal employs eighty-one city drivers, thirty-three road drivers, and fifty-two dockworkers. All drivers are full-time employees, and twenty of the fifty-two dockworkers are full-time employees — the other thirty-two dockworkers are part-time.
The basic requirements for city and road drivers are the same — all drivers must have a commercial driver’s license, at least one year of relevant driving experience (or have gone through FedEx’s one-year dock-to-driver program, see infra) and have acceptable motor-vehicle reports. They must also submit to random drug testing and wear company-issued uniforms. All drivers spend most of their working time away from the dock and are supervised remotely by dispatchers — operational supervisors who rotate between dock and dispatch supervision. In addition, either type of driver “[m]ay be required to perform job duties of [the other type of driver] or [of] a dock employee where operationally necessary.” J.A. 72, 74-75.
The differences between city and road drivers primarily relate to compensation. Although all drivers’ wages are based on their years of experience, city drivers are paid between $20.63 and $24.93 per hour, whether or not they are driving or working on the dock. Road drivers make the same as city drivers when working on the dock or driving locally, but make between $0.53 and $0.62 per mile when driving longer distances.
Unlike drivers, dockworkers work only in the yard or on the dock. Dockworkers load freight onto outbound trailers and unload freight from inbound trailers. They may occasionally drive forklifts and other vehicles within the yard to move equipment from place to place (“hostling”),[4] but this driving does not require a commercial driver’s license nor involve the types of vehicles city and road drivers use.
Moreover — unlike the requirements for drivers — no relevant work experience is required to be a doekworker. Dockworkers are also not required to wear uniforms nor are they subject to random drug testing. Full-time dockworkers, like drivers, select their schedules based on seniority. But part-time dockworkers do not — FedEx assigns part-time dockworkers to a shift when they are hired.
Dockworkers also earn considerably less than drivers. Full-time dockworkers earn an average of $20.13 an hour — fifty cents per hour less than the average city driver — and part-time dockworkers make only between $16.31 and $18.31 per hour. Dockworkers have an opportunity to become drivers through the “doek-to-driver” program,[5] but only about 19 percent of FedEx’s drivers at the South Brunswick Ter *437 minal (24 percent of the road drivers and 16 percent of the city drivers) graduated from the program. No employee has moved in the opposite direction — from driver to dockworker.
Because drivers and dockworkers are employed by FedEx, they unsurprisingly have some common conditions of employment. All drivers and dockworkers are eligible for the same retirement, healthcare benefits, and personal days off (although part-time dockworkers do not receive paid holidays and cannot accrue paid vacation time). In addition, all drivers and dockworkers share the same break room and locker rooms and must abide by the “General Responsibilities” handbook for all FedEx employees. And, as noted, drivers spend a small amount of their time doing dock work. In 2012, about 3.5 percent of city drivers’ time and 10 percent of road drivers’ time was spent performing dock work at the South Brunswick Terminal.[6]
n.
We first address whether FedEx preserved its challenges to Specialty Healthcare. In this case, FedEx incorporated the arguments from its previous request for review of the Regional Director’s unit determination in its Response to Notice to Show Cause. Parties often incorporate, rather than restate, prior arguments because of the Board’s “no-relitigation rule.” Nathan Katz Realty, LLC v. NLRB, 251 F.3d 981, 987 (D.C. Cir. 2001). Under this rule, “[djenial of a request for review [by the Board of the Regional Director’s decision] shall ... preclude relitigating any such issues in any related subsequent unfair labor practice proceeding.” 29 C.F.R. § 102.67(g) (2015); see also Nathan Katz, 251 F.3d at 986 (explaining that under this rule an employer may “incorporate[] by reference and reaffirm[] by reference its post election objections”) (internal quotation marks and citation omitted)). Here, FedEx incorporated in its Response to Notice to Show Cause “the reasons and legal arguments set forth in [its] Request for Review as the basis for its refusal to recognize the Union.” J.A. 217. Therefore, we will consider the arguments set forth in this prior proceeding.
The Board contends FedEx waived any challenges to Specialty Healthcare because, in its request for review, FedEx applied the overwhelming-eommunity-of-interest standard described in Specialty Healthcare rather than argue Specialty Healthcare was wrongly decided. FedEx stated its disapproval of the Specialty Healthcare decision in a footnote.
Under 29 U.S.C. § 160(e), “[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.” 29 U.S.C. § 160(e). The crucial question in a section 160(e) analysis is whether the Board “ ‘received adequate notice of the basis for the objection.’ ” FedEx Freight, Inc. v. NLRB, 816 F.3d 515, 521 (8th Cir. 2016) (quoting Nathan Katz, 251 F.3d at 985); see also NLRB v. FES, 301 F.3d 83, 89 (3d Cir. 2002) (holding that because the “tenor of FES’s challenge before the Board raised a purely factual question” and did not “providef] the basis for its challenge,” FES failed to raise the issue before the Board); Nathan Katz, 251 F.3d at 986 (explaining a petitioner “has forfeited its right to challenge the Board’s disposition” when the petition *438 er “completely fails to raise an issue during an unfair labor practice proceeding” (internal citation and quotation marks omitted)).
Despite the Board’s arguments to the contrary, FedEx’s footnote in its petition for review provided sufficient notice. The footnote reads:
[FedEx] posits that Specialty Healthcare was decided erroneously, largely for the reasons cited in Member Hayes’ dissent therein. However, on the assumption that [the] Board will not now revisit its decision there, [FedEx] alternatively contends that the case at bar was decided incorrectly even under the rule of Specialty Healthcare and its progeny.
J.A. 183 n.4. As indicated, the footnote states clearly “that Specialty Healthcare was decided erroneously,” and gives as the basis for its challenge “the reasons cited in Member [Brian] Hayes’[s] dissent therein.” Id. The footnote also states that FedEx’s argument under Specialty Healthcare’s, overwhelming-community-of-interest test was an alternative argument. Its primary argument was that “Specialty Healthcare was decided erroneously.” But, “on the assumption that [the] Board [would] not now revisit its decision,” FedEx focused its briefing under the alternative theory. Id.[7]
Board Member Harry Johnson’s concurrence in the Board’s summary affirmance of the Regional Director’s unit determination indicates this footnote provided sufficient notice of FedEx’s Specialty Healthcare challenge. Johnson declined to apply the Specialty Healthcare test, finding the unit appropriate under the traditional community-of-interests test. But he recognized the employer’s argument that the Specialty Healthcare standard was misapplied and “acknowledgefd] the well-argued points of the Employer in this case and [in] recent cases” that the Board’s holding in Specialty Healthcare was incorrect. J.A. 4 n.1.
Johnson’s concurrence reflects the Board’s acute awareness of recent and active challenges to Specialty Healthcare. See Macy’s, Inc. v. NLRB, No. 15-60022, 824 F.3d 557, 566-71, 2016 WL 3124847, at *6-*9 (5th Cir. Jun 2, 2016) (addressing challenges to the unit-determination test described in Specialty Healthcare)-, Nestle Dreyer’s Ice Cream Co. v. NLRB, 821 F.3d 489, 498-502 (4th Cir. 2016) (same); FedEx Freight, 816 F.3d at 521-26 (same). The facts at issue and legal standards used in these cases parallel those here. It seems impossible, therefore, that the Board was not on notice FedEx would challenge the Board’s Specialty Healthcare decision.
Moreover, because the Board has refused to reconsider its holding in Specialty Healthcare, employers have chosen to challenge the validity and validation method of unit certifications by refusing to bargain with the union, and appealing these determinations to the relevant federal court of appeals. Accordingly, it is not surprising that FedEx did not pursue its challenge to Specialty Healthcare more vigorously in its request for review before *439 the Board, opting instead to preserve its challenge for this appeal. See also FedEx Freight, 816 F.3d at 521.
Because the Board in this case had adequate notice of FedEx’s challenges to Specialty Healthcare, there was no waiver of these challenges, and we have jurisdiction to review them.
III.
The primary issue before us is whether the Specialty Healthcare Board’s clarification of its unit-determination analysis is reconcilable with prior Board precedent, the NLRA, and the APA. FedEx presses us to overrule Specialty Healthcare, contending it misapplied the initial community-of-interest test and improperly created a new heightened standard — the overwhelming-community-of-interest test.
Section 9(a) of the NLRA provides for the designation or selection of an exclusive representative for the purposes of collective bargaining “by the majority of the employees in a unit appropriate for such purposes.” 29 U.S.C. § 159(a). The Supreme Court has held that section 9(a) “implies that the initiative in selecting an appropriate unit resides with the employees” and that “employees may seek to organize ‘a unit’ that is ‘appropriate’- — not necessarily the single most appropriate unit.” Am. Hosp. Ass’n v. NLRB, 499 U.S. 606, 610, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991) (emphasis in original). Accordingly, a union need not be representative of all employees at a company, but might only include employees “in a particular craft, or perhaps just a portion thereof.” Id.[8]
To guide its resolution of unit determinations, the Board may craft rules through rulemaking or adjudication. Id. at 611-13, 111 S.Ct. 1539. Because these rules interpret the NLRA, they are subject to the principles of Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See NLRB v. United Food & Commercial Workers Union, Local 23, 484 U.S. 112, 123-24, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) (hereinafter “UFCW’). Under Chevron, if Congress has not “spoken to the precise question at issue” and “the statute is silent or ambiguous with respect to the specific issue, the question for the [reviewing] court is whether the agency’s answer is based on a permissible construction of the statute.” Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778. Reviewing courts must “respect the judgment of the agency empowered to apply the law to varying fact patterns, even if the issue with nearly equal reason might be resolved one way rather than another.” Holly Farms Corp. v. NLRB, 517 U.S. 392, 399, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996) (internal citation and formatting omitted); see also UFCW, 484 U.S. at 123, 108 S.Ct. 413 (explaining we “aecord[ ] the Board deference with regard to its interpretation of the NLRA as long as its interpretation is rational and consistent with the statute”); NLRB v. N.J. Bell Tel. Co., 936 F.2d 144, 147 (3d Cir. 1991).
A Board decision may be unreasonable if it incorporates new law but fails to “clearly announce[ ]” the law, as this inhibits appellate courts’ “review [of the legal changes] for their reasonableness and their compatibility with the Act.” Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 378, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998); see also Comite’ De Apoyo a Los Trabajadores Agricolas v. *440 Perez, 774 F.3d 173, 190 (3d Cir. 2014) (“Failure to consider relevant factors or provide an adequate explanation for an agency action are indeed among the wide range of reasons why agency action may be judicially branded as arbitrary and capricious.” (internal citation and quotation marks omitted)).
In Specialty Healthcare, the Board articulated a two-step unit-determination test. First, under the initial community-of-interest test, the Board determines whether the unit is an appropriate unit, applying relevant traditional factors. 357 N.L.R.B. No. 83, at *15. And second, if notwithstanding this finding, a party contends additional employees should be added, the Board looks at whether the “employees in the more encompassing unit share ‘an overwhelming community of interest’ such that there ‘is no legitimate basis upon which to exclude certain employees from it.’ ” Id. at *16 (quoting Blue Man Vegas, LLC v. NLRB, 529 F.3d 417, 421 (D.C. Cir. 2008)).
This heightened showing is required because “the statute requires only an appropriate unit” and “it cannot be that the mere fact that they also share a community of interest with additional employees renders the smaller unit inappropriate.” Id. at *15 (citing Blue Man Vegas, 529 F.3d at 421; Dunbar Armored, Inc. v. NLRB, 186 F.3d 844, 847 (7th Cir. 1999); and Montgomery Ward & Co., 150 N.L.R.B. 598, 601 (1964)). The Board explained that although it “has sometimes used different words to describe this [overwhelming-community-of-interest] standard and has sometimes decided cases such as this without articulating any clear standard,” its evaluation of Board and appellate court precedent showed it had consistently applied a heightened standard in such situations. Id. at *17.
A.
We hold the initial community-of-interest test described and applied by the Board in Specialty Healthcare was in line with Board precedent. In Specialty Healthcare, the Board explained that for a bargaining unit to be appropriate, its members must share a community of interest. This determination requires an analysis and weighing of “traditional” relevant criteria or factors. Specialty Healthcare, 357 N.L.R.B. No. 83, at *15. These factors may include:
“[WJhether the employees are organized into a separate department; have distinct skills and training; have distinct job functions and perform distinct work ... [have] job overlap ...; are functionally integrated with the Employer’s other employees; have frequent contact with other employees; interchange with other employees; have distinct terms and conditions of employment; and are separately supervised.”
Id. (quoting United Operations, Inc., 338 N.L.R.B. No. 18, 2002 WL 31257999, at *1 (2002)); see also NLRB v. Saint Francis Coll., 562 F.2d 246, 249 (3d Cir. 1977); Bartlett Collins Co., 334 N.L.R.B. 484, 484 (2001) (“In determining whether the employees possess a separate community of interest, the Board examines such factors as mutuality of interest in wages, hours, and other working conditions; commonality of supervision; degree of skill and common functions; frequency of contact and interchange with other employees; and functional integration.”).
Applying this standard, the Specialty Healthcare Board noted similarities among the employees within the petitioned-for unit, and distinctions between them and excluded employees. See Specialty Healthcare, 357 N.L.R.B. No. 83, at *14. (“[Included employees] wear distinctive [uniforms],” have “separate and dis *441 tinct” supervision, have “distinct wage scale,” and there was limited interaction between the groups). The Board also found “no evidence of significant functional interchange or overlapping job duties” between included and excluded employees, id., and emphasized the importance of departmental structure as an organizing principle, see id. at *17.
This initial community-of-interest test— and its application — reflects the standard used by the Board in prior decisions. See Macy’s, 824 F.3d at 568, 2016 WL 3124847, at *7 (“The community of interest test articulated in Specialty Healthcare and applied in this case was taken from the Board’s 2002 decision in United Operations ... [and] does not look only at the commonalities within the petitioned-for unit” but asks “ ‘whether the employees are organized into a separate department ... [and] have distinct skills and training....’” (emphasis in original) (quoting Specialty Healthcare, 357 N.L.R.B. No. 83, at *14)). Accordingly, the Board’s initial community-of-interest analysis in Specialty Healthcare was not an abuse of discretion.[9]
B.
FedEx next contends the Specialty Healthcare Board abused its discretion by standardizing the heightened “overwhelming-community-of-interest” test it applies when an interested party claims “the smallest appropriate unit contains additional employees.” Specialty Healthcare, 357 N.L.R.B. No. 83, at *15. FedEx offers three reasons for its conclusion. First, it contends Board precedent does not support the test; second, it claims the test violates section 9(c)(5) of the NLRA; and third, it argues the test is a rule of general application and should have been created through rulemaking, rather than through adjudication. We find none of these reasons persuasive.
1. The Board’s Unit-Determination Precedent
FedEx contends the Specialty Healthcare Board failed to provide a reasoned explanation for the “adoption” of the ■overwhelming-community-of interest test. Like our sister circuits, we believe FedEx “overstates the changes the Board made in Specialty Healthcare.... [T]he Board clarified — rather than overhauled — its unit-determination analysis.” Nestle Dreyer’s, 821 F.3d at 500; see also Macy’s, Inc., 824 F.3d at 567, 2016 WL 3124847, at *6 (quoting Nestle Dreyer’s, 821 F.3d at 500); FedEx Freight, 816 F.3d at 525 (‘We conclude that the overwhelming community of interest standard articulated in Specialty Healthcare is not a material departure from past precedent ...”); Kindred Nursing Ctrs., LLC v. NLRB, 727 F.3d 552, 561 (6th Cir. 2013) (“The Board has used the overwhelming-community-of-interest standard before, so its adoption in Specialty Healthcare ... is not new.”); Blue Man *442 Vegas, 529 F.3d at 421 (explaining the Board’s unit-determination cases “generally conform to a consistent analytic framework” in which, to challenge a unit that is “prima facie appropriate” — i.e., a unit in which the employees share a community of interest — the employer must make a heightened showing that the unit is “truly inappropriate”) (internal citation and quotation marks omitted)).
As the Specialty Healthcare Board explained, although it has used different words to describe the heightened standard, it has long required “a showing that the included and excluded employees share an overwhelming community of interest.” 357 N.L.R.B. No. 83, at *16; see also FedEx Freight, 816 F.3d at 523-24. For example, in United Rentals, 341 N.L.R.B. 540, 541 (2004), cited by the Board in Specialty Healthcare, the Board reversed the Regional Director’s approval of the unit because “the overwhelming and undisputed evidence of overlapping duties and interchange between the excluded employees and the petitioned-for employees” demonstrated the excluded employees “share[d] ... a substantial community of interest with the petitioned-for employees.” 341 N.L.R.B. at 541-42. And in Lanco Construction Systems, Inc., 339 N.L.R.B. 1048 (2003), as here, the Board considered and rejected the employer’s argument that additional employees shared an “overwhelming community of interests with its solely-employed carpenters and helpers” requiring their inclusion in the unit. 339 N.L.R.B. at 1049; see also Overnite Transp. Co., 322 N.L.R.B. 723, 726 (1996) (explaining that the excluded employees would “constitute a separate appropriate unit and do not share such a close community of interest ... as would mandate their inclusion in the petitioned-for unit” (emphasis omitted)).
The Specialty Healthcare Board also cited the D.C. Circuit’s opinion in Blue Man Vegas, decided three years earlier, as an accurate reflection of the Board’s historic use of a heightened, overwhelming-community-of-interest standard in such circumstances. 357 N.L.R.B. No. 83, at *16. Citing various Board decisions, the D.C. Circuit explained that the Board’s “unit determination cases generally conform to a consistent analytic framework” in which, under the initial community-of-interest test, the Board determines whether the unit is “prima facie appropriate,” and then, because there can be more than one appropriate bargaining unit, the person challenging the unit must show the appropriate unit is “truly inappropriate.” Blue Man Vegas, 529 F.3d at 421 (internal quotation marks and citation omitted). The Board finds a unit is truly inappropriate, the D.C. Circuit explained, if the excluded employees “share an overwhelming community of interest with the included employees” such that there is “no legitimate basis upon which to exclude them.” Id. The Board’s citation to and approval of the D.C. Circuit’s understanding of Board precedent was not an adoption of new law, but an attempt to standardize the phrasing of its “consistent analytic framework.”
It is important to note, as the Fourth Circuit has, that some statements in Specialty Healthcare might indicate significant changes in Board policy. Of most importance, the Board seems to suggest that “whether employees are appropriately excluded from the petitioned-for unit is addressed only in step two, the overwhelming-community-of-interest analysis, not in step one, the traditional community-of-interest analysis.” Nestle, 821 F.3d at 500 (emphasis in original). This would constitute a significant change. But, as noted supra, under the initial community-of-interest test, the Specialty Healthcare Board did not look “solely and in isolation, *443 [at] the question [of] whether the employees in the unit sought have interests in common with one another.” Newton-Wellesley Hosp., 250 N.L.R.B. 409, 411 (1980). Rather, it looked at similarities between the employees in the petitioned-for unit and whether their interests were sufficiently distinct from other employees. Because we find the ultimate holdings of Specialty Healthcare, with respect to the unit-determination standards, were not departures from Board precedent, we conclude the Board’s interpretation and clarification of the NLRA was reasonable and not an abuse of discretion.
2. Violation of NLRA Section 9(c)(5)
FedEx also contends the Specialty Healthcare Board’s overwhelming-community-of-interest test violates section 9(c)(5) of the NLRA because it ensures the union’s choice is almost always the controlling factor.
Section 9(c)(5) states that “the extent to which the employees have organized shall not be controlling.” 29 U.S.C. § 159(c)(5). But the extent to which employees have organized can still be considered. Although Congress “intended to overrule Board decisions where the unit determined could only be supported on the basis of the extent of organization,” it is clear from “both the language and legislative history of § 9(c)(5) ... that the provision was not intended to prohibit the Board from considering the extent [to which employees have organized] as one factor, though not the controlling factor, in its unit determination.” NLRB v. Metro. Life Ins. Co., 380 U.S. 438, 441-42, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965) (emphasis added) (internal footnote omitted).
FedEx contends that under Specialty Healthcare, the union’s initial burden to show the proposed unit is appropriate has been truncated — instead of showing the employees are similar to one another and distinct from other employees, the union now only has to show the employees in the proposed unit are readily identifiable as a group. As discussed supra, this is not the test. The union must first show the employees comprise a readily identifiable' group and share a community of interest under the traditional test. Then, following a finding of appropriateness, if a party wants to add additional employees, it must show the additional employees share an overwhelming community of interest with those in the original unit. See Specialty Healthcare, 357 N.L.R.B. No. 83, at *15. Therefore, we agree with the Fourth, Fifth, Sixth, Eighth, and D.C. Circuits that “so long as the overwhelming community of interest test is applied ‘only after the proposed unit has been shown to be pri-ma facie appropriate, the Board does not run afoul of the statutory injunction that the extent of the union’s organization not be given controlling weight.’ ” FedEx Freight, 816 F.3d at 525 (emphasis in original) (quoting Kindred Nursing, 727 F.3d at 565); see also Blue Man Vegas, 529 F.3d at 423.
In accordance with the Fourth Circuit’s recent interpretation of its own precedent in Nestle Dreyer’s, the Fourth Circuit’s reasoning in NLRB v. Lundy, 68 F.3d 1577 (4th Cir. 1995), does not persuade us otherwise. In Lundy, the Board presumed the union-proposed unit was appropriate, and then applied an overwhelming community-of-interest standard. In other words, the Board never determined whether the unit was appropriate under the traditional community-of-interest test, but assumed it was and skipped to the question of whether there was an overwhelming community of interest between the employees. The Fourth Circuit found this method effectively excluded employees suggested by the *444 employer in violation of section 9(c)(5). Lundy, 68 F.3d at 1581.
The facts of Lundy distinguish it from Specialty Healthcare. As the Fourth Circuit recently explained in Nestle Dreyer’s:
Lundy does not establish that the overwhelming-community-of-interest test as later applied in Specialty Healthcare fails to comport with the NLRA. Instead, Lundy prohibits the overwhelming-community-of-interest test where the Board first conducts a deficient community-of-interest analysis- But in Lundy we had no occasion to determine whether the overwhelming-community-of-interest test would offend the NLRA in a case where the Board properly conducts Specialty Healthcare’s step-one analysis by determining that the members of the petitioned-for unit share a distinct community of interest. With such a case now before us,, we find Lun-dy distinguishable.
Nestle Dreyer’s, 821 F.3d at 499. Each circuit court to hear this issue has found likewise.[10]
Finally, FedEx contends that even if the overwhelming-community-of-interest standard is not a de jure violation of section 9(c)(5), recent Board decisions suggest the, test creates such an impossible standard for employers to meet that as applied, it will always privilege the employees’ proposed unit.[11] This privileging occurs, FedEx argues, because the Board promotes the departmental or administrative form over all commonly shared factors, making the appropriateness of the unit a foregone conclusion in almost all circumstances.
This argument is unconvincing. Even if the Board has approved more units organized along departmental lines — lines-often created by the employer — it does not follow that the Board privileges the unit determinations of the employees, and FedEx has not shown otherwise. Moreover, the Board has been clear that it will not approve “fractured” units or arbitrary segments of employees. See Odwalla, Inc., 357 N.L.R.B. No. 132, at *5 (2011) (using the overwhelming-community-of-interest test to find additional employees should be included in the otherwise appropriate unit *445 because the recommended unit was a fractured unit — an “arbitrary segment” with no rational basis); see also Neiman Marcus Grp., Inc., 361 N.L.R.B. No. 11, 2014 WL 3724884, at *4 (2014) (finding there was no community of interest because “[t]he boundaries of the petitioned-for unit [did] not resemble any administrative or operational lines drawn by the Employer,” but not reaching the overwhelming-community-of-interest test).
Accordingly, we conclude the overwhelming-community-of-interest test clarified in Specialty Healthcare does not conflict with section 9(c)(5).[12]
3. Rulemaking Versus Adjudication
Finally, FedEx contends Specialty Healthcare was wrongly decided because the overwhehning-community-of-interest test was a new policy and should have been promulgated through rulemaking rather than adjudication.
We recognize that “the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.” SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947).[13] But as previously explained, the overwhelming-community-of-interest test described in Specialty Healthcare was not new policy, but a consolidation and clarification of the heightened standard used by the Board in prior similar situations. Therefore, we need not address whether the Board abused its sound discretion in this regard.
IV.
Having found the Board’s clarification of the unit-determination standard in Specialty Healthcare reasonable, we consider whether the Board properly applied this two-step framework here.
In this case, the Regional Director, as confirmed by the Board, found (1) the petitioned-for unit of FedEx drivers was an appropriate unit under the initial community-of-interest test; and (2) the dockworkers did not share an overwhelming community of interest with the drivers such that they must be included in the unit.
To reiterate, under the initial community-of-interest test, the Board weighs a variety of factors — selected based on their relevance to the unit at hand — to determine whether the employees in the petitioned-for unit share a community of interest. These factors may include whether the employees in the unit are “organized into a separate department; have distinct skills *446 and training; have distinct job functions and perform distinct work[;] ... are functionally integrated with the Employer’s other employees; ... have distinct terms and conditions of employment; and are separately supervised.” United Operations, 338 N.L.R.B., at *1. Applying this test, the Regional Director first looked at whether the union had shown the petitioned-for unit comprised a “clearly identifiable group” — i.e., whether the employees in the unit were internally similar or made up a fractured unit — and then at whether this group shared a community of interest. He found the group was “clearly identifiable because ..'. ‘it track[ed] a dividing line drawn by the Employer.’” J.A. 12 (citing Macy’s Inc., 861 N.L.R.B. No. 4, 2014 WL 3613065, at *12 (2014)). Specifically, “[t]he petitioned-for unit [was] structured along the lines of classification, job function, and skills,” and although the dockworkers and drivers were not in separate departments, “there [was] no question that the Employer treat[ed] the driver classification differently in almost every operational and administrative sense.” Id. The Regional Director also found the ,drivers distinguishable from the dockworkers because of their uniform requirements, commercial driver’s license requirements, and driver-specific job descriptions. Id.
For many of the same reasons, the Regional Director found the drivers in the petitioned-for unit shared a community of interest. They “engaged in virtually the same task — moving freight from place to place,” were “distinctly qualified and skilled because of their licensure requirements, and use[d] the same type of equipment.” Id. at 13. Moreover, all drivers were full-time employees with the same benefits and similar compensation, experienced similar working conditions, were subjected to random drug testing, and applied for shifts based on seniority.
We find the Regional Director’s application of the initial community-of-interest test (which was adopted by the Board) was not an abuse of discretion. He weighed relevant factors to determine whether the union had shown the petitioned-for unit was an appropriate unit — looking not only at whether the employees in the petitioned-for unit were similar and comprised a readily identifiable group, but also at whether these employees were sufficiently distinct from other employees.
The Regional Director also properly applied the overwhelming-community-of-interest analysis. Under this test, the burden switched to FedEx to show that an otherwise appropriate unit of drivers was inappropriate because dockworkers shared an overwhelming community of interest with them. The Regional Director agreed with the union, finding sufficient distinctions between the employees. He noted that dockworkers have no prerequisites for employment, whereas drivers must have a Class A commercial driver’s license with various certifications, and that, unlike dockworkers, drivers are subject to random drug testing because of the nature of their work. The Regional Director also noted the disparity in wages between dockworkers (including part-time dockworkers) and drivers, and the distinct work locations of the employees — dockworkers “work almost exclusively within the Terminal,” while drivers work outside the terminal. J.A. 13. He also observed that dockworkers and drivers do not frequently interact with one another, and that there is only a one-way interchange between positions — from dockworker to driver through the dock-to-driver program.
The Regional Director did recognize “a few areas of commonality between the three classifications, chiefly in common supervision,” but he concluded that “these areas [fell] far short of establishing the *447 overwhelming community of interest between the Dockworkers and the employees in the petitioned-for unit that would be necessary to require the Dockworkers’ inclusion.” Id.
Given the Board’s discretion to find an appropriate unit — not necessarily the most appropriate unit — and our deferential standard of review, we hold the Board’s conclusion that there was no overwhelming community of interest was not an abuse of discretion.
V.
For the foregoing reasons, we will deny FedEx’s petition for review and grant the Board’s cross-petition for enforcement of its order.

. “[T]o challenge the union’s certification the employer must refuse to bargain, triggering unfair labor practice proceedings under Section 8(a)(5).” Wellman Indus., Inc. v. NLRB, 490 F.2d 427, 430 (4th Cir. 1974); see also St. Margaret Mem'l Hosp. v. NLRB, 991 F.2d 1146, 1151 n.5 (3d Cir. 1993) ("Because certification orders are not final appealable orders, St. Margaret had to expose itself to unfair labor practice charges in order to challenge the validity of the certification in the courts.” (internal citations omitted)),

. The Board had jurisdiction under 29 U.S.C. § 160(a) of the NLRA. We have jurisdiction over this appeal from the Board's decision under 29 U.S.C. § 160(e) because FedEx conducts business in New Jersey.

. Neither party contends the South Brunswick Terminal's administrative employees should be part of the unit.

. FedEx describes hostling as "staging trailers in the yard by moving an empty trailer to a specific door on the dock for loading, or moving a trailer that was just unloaded away from the dock.” J.A. 188 n.6.

.This program allows dockworkers to train to become drivers with FedEx, and includes a five-week training course to help dockworkers get a commercial driver’s license. Dockworkers work full-time as dockworkers while participating in the program.

. In 2012, this represented 14 percent of all dock work performed at the South Brunswick Terminal.

. In a parallel case, the Eighth Circuit also held FedEx did not waive the Specialty Healthcare argument. See FedEx Freight, 816 F.3d at 521 ("FedEx stated in a footnote in each of its requests for review of the determinations by the regional director that ‘Specialty Healthcare was decided erroneously’ for the reasons stated in Board member Hayes' dissent.... The Board was aware of the FedEx challenge to Specialty Healthcare.... This gave the Board adequate notice that FedEx was objecting to the regional director's use of the Specialty Healthcare framework. We therefore have jurisdiction to review the FedEx claims.”).

. Section 9(b) of the NLRA grants the Board the authority to determine whether a unit is appropriate. 29 U.S.C. § 159(b).

. The Specialty Healthcare Board's analysis under the initial community-of-interest test is also in line with our precedent. We have described twelve factors the Board often considers in unit determinations:
(1) similarity in the scale and manner of determining earnings; (2) similarity in employment benefits, hours of work and other terms and conditions of employment; (3) similarity in the kind of work performed; (4) similarity in the qualifications, skills and training of the employees; (5) frequency of contact or interchange among the employees; (6) geographic proximity; (7) continuity or integration of production processes; (8) common supervision and determination of labor-relations policy; (9) relationship to the administrative organization of the employer; (10) history of collective bargaining; (11) desires of the affected employees; [and] (12) extent of union organization.
Saint Francis Coll., 562 F.2d at 249 (quoting Robert A. Gorman, Labor Law: Unionization and Collective Bargaining 69 (1976)).

. See Macy's, Inc., 2016 WL 3124847, at *7 (“Where the Board 'rigorously weights] the traditional community-of-interest factors 'to ensure that the proposed unit was proper under the NLRA ... the overwhelming community of interest’ [test] does not conflict with the Act.... That is precisely what the Board did in the instant case. As a result, the test and its application do not violate Section 9(c).” (quoting Nestle Dreyer’s, 821 F.3d at 499)); FedEx Freight, 816 F.3d at 525-26 ("The Lundy court did not hold that any heightened standard violates section 9(c)(5)_ We agree with the D.C. Circuit that the use of an overwhelming community of interest test at the second step of the Board’s analysis does not violate section 9(c)(5) because the Board ‘did not presume the union’s proposed unit was valid, as it had done in Lundy.' ” (quoting Blue Man Vegas, 529 F.3d at 423)); Kindred Nursing, 727 F.3d at 564-65 ("[T]he Board did not [violate section 9(c)(5) by] assuming] that the CNA-only unit was appropriate. Instead, it applied the community-of-interest test- ... to find that there were substantial factors establishing that the CNAs shared a community of interest and therefore constituted an appropriate unit.... Nor does the overwhelming-community-of-interest test violate section 9(c)(5) ... 'as long as the Board applies the overwhelming community of interest standard only after the proposed unit has been shown to be prima facie appropriate....’” (internal formatting omitted) (emphasis in original) (quoting Blue Man Vegas, 529 F.3d at 423)).

. Some of the cases cited by FedEx include: DPI Secuprint, Inc., 362 N.L.R.B. No. 172, 2015 WL 5001021 (2015); Guide Dogs for the Blind, Inc., 359 N.L.R.B. No. 151, 2013 WL 3365658 (2013); Fraser Eng’g, 359 N.L.R.B. No. 80, 2013 WL 1181583 (2013); and DTG Operations, Inc., 357 N.L.R.B. No. 175, 2011 WL 7052275 (2011).

. FedEx also argues the Specialty Healthcare Board improperly imported the overwhelming-community-of-interest test from accretion cases, in which "new employees are added to an existing bargaining unit without a representation election; therefore, the showing of shared characteristics must be higher to protect employee interests.” Lundy, 68 F.3d at 1581 (emphasis in original). This argument is not persuasive. Although the "overwhelming-community-of-interest” language from the Specialty Healthcare test is the same language used in accretion cases, the frameworks of the tests are different. Unlike in accretion cases, in unit-determination cases like Specialty Healthcare and this case, the Board applies the "overwhelming-community-of-interest” test only after conducting an initial community-of-interest analysis and finding the employee-proposed unit appropriate.

. Moreover, the Board, "uniquely among major federal administrative agencies, has chosen to promulgate virtually all the legal rules in its field through adjudication rather than [through] rulemaking.” Allentown, 522 U.S. at 374, 118 S.Ct. 818; see also Charlotte Garden, Toward Politically Stable NLRB Lawmaking: Rulemaking vs. Adjudication, 64 Emory L.J. 1469, 1471 (2015) (explaining the Board generally creates policies through adjudication rather than through rulemaking).